The UNITED STATES, Appellant,

v.

GILA RIVER PIMA–MARICOPA INDIAN COMMUNITY et al., Appellees.

Appeal No. 4–76.

United States Court of Claims.

Oct. 18, 1978.

Nichols, J., concurred with opinion.

David M. Marshall, Washington, D. C., with whom was Asst. Atty. Gen., James W. Moorman, Washington, D. C., for appellant.

Z. Simpson Cox, Phoenix, Ariz., attorney of record, for appellees; L. J. Cox, Jr., Alfred S. Cox, Phoenix, Ariz., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KUNZIG and BENNETT, Judges, en banc.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

KUNZIG, Judge:

This action, involving an Indian claim against the Government to recover monies alleged to have been wrongfully collected, comes before the court on the Government's appeal of two decisions by the Indian Claims Commission (the Commission)[1] in favor of the Gila River Pima-Maricopa Indian Community (plaintiffs or Indians). The specific monies which the Indians seek to recover were collected by the Government as charges for the operation and maintenance of an irrigation system which delivered water to Indian lands. Because we conclude that the Government was without authority to collect the fees in issue, we agree with the Commission that the Indians are entitled to recover the amounts wrongfully collected. However, we modify the award for interest as explained herein.

Archeological evidence and missionary reports demonstrate that plaintiffs' ancestors practiced relatively advanced forms of irrigation for many hundreds of years before the arrival of white settlers in the 1860's. By the middle of the nineteenth century, the Indians' agricultural activity, which was the principal basis of their subsistence, was concentrated along both sides of the Gila River. Up to the time of arrival of the white settlers, the Indians enjoyed unrestricted use of the waters flowing in the Gila River. Following the accession of the area by the United States, non-Indians began settling upstream of the Indians and diverting the Indians' water.[2]

In 1898, congressional concern with the Indians depleting water supply led to an appropriation of funds for the Bureau of Indian Affairs to investigate the feasibility and cost of a dam across the Gila River.[3] Funds for general irrigation works were first provided in 1903 and these projects,

1. In *Gila River Pima-Maricopa Indian Community v. United States*, 33 Ind.Cl.Comm. 18 (1974), the Commission unanimously found for the Indians as to liability. In *Gila River Pima-Maricopa Indian Community v. United States*, 38 Ind.Cl.Comm. 1 (1976), the Commission determined the amount of recovery; however, two members dissented as to the amount of interest recoverable. 38 Ind.Cl.Comm. at 37-39.

2. Arizona, in the custom typical of western states, recognizes that first appropriators of water have rights paramount to others in use of the water and the Commission found that the Pima Indians were entitled to first priority to divert 210,000 acre feet of water per season from the Gila River.

3. Act of July 1, 1898, ch. 545, 30 Stat. 571, 594.

plus additional projects, received further funds through 1919.[4] However, these works gave only partial relief to the Indians and were only a portion of the recommendations made by various experts who had studied the Gila River water problems.[5] Each of these appropriation acts contained some provision, in general terms, for the payment of construction *and* operation costs.[6]

The San Carlos Act, Act of June 7, 1924, ch. 288, 43 Stat. 475 (the Act) provided for continuing construction work on the San Carlos Federal irrigation project (the Project). Section 1 authorized the construction of a dam over the Gila River. The purpose of the dam was:

> . . . [F]irst, of providing water for the irrigation of lands allotted to Pima Indians on the Gila River Reservation, Arizona, now without an adequate supply of water and, second, for the irrigation of such other lands in public or private ownership, as in the opinion of the said Secretary [of Interior], can be served with water impounded by said dam without diminishing the supply necessary for said Indian lands . . . . .

Section 1 also required:

> . . . [t]hat the total cost of the project shall be distributed equally per acre among the lands in Indian ownership and the lands in public or private ownership that can be served from the waters impounded by said dam.

Section 2 of the Act contained a requirement that the "construction charge assessed against the Indian lands shall be reimbursable to the Treasury of the United States on a per acre basis." Section 3 required that operation and maintenance charges for land in private ownership or in Indian ownership operated under lease be paid annually, but exempted these payments for the first year of operation.

Coolidge Dam was completed in 1928 creating the present water storage facility known as the San Carlos Reservoir. The completion of the dam was the culmination of the San Carlos Irrigation Project,[7] which then embraced 100,000 acres of land, approximately half Indian and the rest in public or private ownership. Water became first available from the Project in 1933.

> . . . [W]hen said irrigation system is in successful operation and the Indians have become self-supporting the cost of operating the said system shall be equitably apportioned upon the lands irrigated. . . .

This provision was repeated in the Act of June 21, 1906, ch. 3504, 34 Stat. 325, 333 which provided additional funds, and the Act of April 4, 1910, ch. 140, § 3, 36 Stat. 269, 273, provided for repayment in accordance with the provisions of the 1905 Act, *supra.* The Act of August 24, 1912, ch. 388, § 2, 37 Stat. 518, 522 appropriated funds for maintenance and made such funds reimbursable "when funds may be available therefore." Funds for the 1916 Act, *supra* note 4, which authorized the diversion dams, were made reimbursable in accordance with the provisions of the 1912 Act, as were the Act of March 2, 1917, ch. 146, § 2, 39 Stat. 969, 974, the Act of May 25, 1918, ch. 86, § 2, 40 Stat. 561, 568, and the Act of June 30, 1919, ch. 4, § 2, 41 Stat. 3, 10, all of which involved appropriations for continuing the work on the various Gila River projects.

---

4. The Act of March 3, 1903, ch. 994, 32 Stat. 982, 997 provided $150,000 for general irrigation works to be administered under the authority and discretion of the Secretary of Interior. The Act led to a program of drilling wells on Indian lands. More extensive works were provided for in the Act of March 3, 1905, ch. 1479, § 10, 33 Stat. 1048, 1081 which contained a cost limitation of $540,000.

   Between 1906 and 1919, additional appropriation acts were passed which provided funds for the continuance of irrigation projects authorized by the 1905 Act and also provided for additional projects, including diversion dams and related controlling works, such as the Act of May 18, 1916, ch. 125, § 2, 39 Stat. 123, 129–30, which provided funds for diversion dams on the Gila Reservation.

5. An early report, completed in 1896 by Arthur P. Downs, hydrographer for the Bureau of Reclamation, recommended the construction of a storage reservoir at an initial cost of $2,244,-000. It was this report which led to the feasibility study authorized by the Act of July 1, 1898, *supra* note 3.

6. The 1905 Act, *supra* at note 4, which provided for the beginning of the irrigation system for the Gila River Reservation, also provided that

7. The Act of March 7, 1928, ch. 137, 45 Stat. 200, 211, provided for the merger of the 1924 projects with the earlier construction projects in the Gila River area.

In 1934, the Secretary of Interior first informed the Indians that they would be liable for operation and maintenance charges. A formal regulation was issued setting the assessment rate for the charges on a per acre basis.[8] The Indians objected, and a three-year moratorium was declared relieving the Indians from these payments for 1934–36. The assessments were, however, reinstated in 1937 and the Indians objected through tribal resolutions. Under the threat of having the water supply eliminated, the Indians passed a tribal resolution, dated June 16, 1937, agreeing to pay the charges. Similar objections were made each year up until this petition was filed.[9]

This case presents us with four basic issues. In Part I of this opinion, we deal with the extent of the jurisdiction of the Commission, and of this court, for claims accruing prior to 1946 and continuing beyond. Part II sets forth our determination of congressional intent in the 1924 Act. The defendant's contention that various actions by the Government and by the Indians after passage of the Act preclude the return of the amounts collected is discussed in Part III. Our decision as to the proper measure of interest the Indians can recover appears in Part IV.

However, the main issue in this case (discussed in Part II) is one of congressional intent. The Government raises the question of whether Congress intended the Indians to pay operation and maintenance charges. The Indians say no; the Government says yes. We hold for plaintiffs-Indians.

## I. POST 1946 JURISDICTION

■ The Government questions whether the Indian Claims Commission had jurisdiction over the amounts paid after 1946.

Claims accruing prior to August 14, 1946 are to be handled by the Commission while later claims are to be brought in this court. 25 U.S.C. § 70a (1976); 28 U.S.C. § 1505 (1976). This court, of course, has appellate jurisdiction over claims in which the Commission had original jurisdiction. The contention is made that claims for amounts paid after 1946 should have been brought originally in this court and not before the Commission.

■ We have on two previous occasions dealt with this jurisdictional problem involving these same Indians and the same claims.[10] In *Gila River Pima-Maricopa Indian Community v. United States*, 140 F.Supp. 776, 135 Ct.Cl. 180 (1956), this court recognized the dilemma of the Indians who were faced with a statute of limitations problem and two courts to choose from. The Indians filed claims before both the Commission and this court. We refused to dismiss the claim before us, but held it in abeyance, leaving to the Commission the initial determination of the extent of its (the Commission's) jurisdiction.

In *Gila River Pima-Maricopa Indian Community v. United States*, 157 Ct.Cl. 941 (1962), this court held that the alleged acts for which plaintiffs seek relief occurred prior to 1946 and "that the Indian Claims Commission has jurisdiction to award just compensation of such acts whether the full content thereof became apparent before or after 1946." 157 Ct.Cl. at 942.

We have decided in an opinion issued today, *Navajo Tribe v. United States*, Nos. 69, 299, 353, 586 F.2d 192 (Ct.Cl.1978) (en banc), [relying heavily on our two earlier decisions in *Gila*] that the Commission *did* have jurisdiction of "continuing claims." Our reasons for so holding are set forth in detail in that opinion.

8. The current regulation can be found in 25 C.F.R. § 221.110 (1977). It is harmonious with earlier regulations except for the rate, which has been increased each year.

9. The Government created a tribal farm of approximately 12,000 acres, of which 10,899 acres were tribal land. The purpose of this farm was to provide the Indians with a source of funds to pay the water charges. The farm was operated by the Government until 1951 when the tribal farm assets were returned to the Indians.

10. These two cases are discussed in detail in our opinion, also issued today, in *Navajo Tribe v. United States*, Nos. 69, 299, 353, 586 F.2d 192 at 197 198 (Ct.Cl.1978).

## II. CONGRESSIONAL INTENT

For our first inquiry in determining the meaning of a statute, we turn to the statute itself. Section 1 states that the primary purpose of the Act is "providing water for the irrigation of lands allotted to the Pima Indians . . ., now without an adequate supply of water." The second purpose is that of "irrigation of such other lands . . . [which] can be served . . . without diminishing the supply necessary for said Indian lands." Section 2 deals with the assessment of construction charges against Indian lands, and *does not mention operation and maintenance charges.*

Section 3 [11] deals with the assessment of construction charges against lands in private ownership. It also requires operation and maintenance charges against lands in private ownership (and lands owned by Indians but operated under lease) to be paid annually. However, these lands were to be exempt from the charges for the first year that water was available. *This is the only mention of operation and maintenance charges in the Act.*

Yet the Government would apply such charges to Indian lands, although nowhere in the Act do any words appear that clearly state that Indian lands are liable for these charges. In fact Congress was totally silent as to the application of operation and maintenance charges to Indian lands. We agree with the Commission that "[t]he 'construction charges' of Section 2 cannot be thought to include operation and maintenance charges when Section 3 expressly names the latter in distinction to construction costs." 33 Ind.Cl.Comm. at 23.

Furthermore, if we were to accept the Government's argument that Indian lands were somehow liable for operation and maintenance charges, then those lands would have been liable even for that first year for which other lands had been exempted. Such an interpretation is repugnant to the congressional purpose, as evidenced in Section 1, that the Act was primarily to provide *Indians* with water.

In construing statutes applicable to Indians, the Supreme Court has required that "doubtful expressions" be resolved in favor of the Indians. *Squire v. Capoeman,* 351 U.S. 1, 6–7, 76 S.Ct. 611, 100 L.Ed. 883 (1956); *Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912). Combining this rule with the words of the statute, which (giving the Government the benefit of the doubt) can still be said to fall into the "doubtful expression" category, is enough for us to hold that the Act did not require operation and maintenance charges to be paid on Indian lands.

However, it is still necessary to turn to several other factors bearing upon congressional intent which the Government has raised.

The Government claims that the Secretary of Interior and the Bureau of Indian Affairs, both authorized by Congress to administer the Act, should be deferred to in interpreting the Act. Although this principle is generally correct, *see Northern Indian Public Service Company v. Walton League,* 423 U.S. 12, 15, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975); *Kantor v. United States,* 205 Ct.Cl. 1, 7 (1974), it has long been held that for an administrative interpretation to be entitled

11. Section 3 reads:

Sec. 3. The Secretary of the Interior shall by public notice announce the date when water is available for lands in private ownership under the project, and the amount of the construction charge per irrigable acre against the same, which charge shall be payable in annual installments, the first installment to be 5 per centum of the total charge and be due and payable on the 1st day of December of the third year following the date of said public notice, the remainder of the construction charge, with interest on deferred amounts from date of said public notice at 4 per centum per annum, to be amortized by payment on each December 1st thereafter of 5 per centum of said remainder until the obligation is paid in full: *Provided,* That the operation and maintenance charges on account of land in private ownership or of land in Indian ownership operated under lease shall be paid annually in advance not later than March 1st, no charge being made for operation and maintenance for the first year after said public notice. It shall be the duty of the Secretary of the Interior to give such public notice when water is actually available for lands in private ownership.

to controlling or substantial weight, the interpretation must be substantially contemporaneous with the enactment of the legislation. *See Wisconsin Central Railroad v. United States*, 164 U.S. 190, 205, 17 S.Ct. 45, 41 L.Ed. 399 (1896). We do not deem controlling here an administrative interpretation made in 1936 (that Indians must pay operation and maintenance charges) when the Act was passed twelve years earlier. *See United States v. Manzi*, 16 F.2d 884 (1st Cir. 1926) (holding administrative construction of 14 year old statute not contemporaneous and entitled to little or no weight), *reversed on other grounds*, 276 U.S. 463, 48 S.Ct. 328, 72 L.Ed. 654 (1928).

We are also urged by the Government to accept the understanding of Senator Hayden, the Act's sponsor, as to whether or not operation and maintenance charges were to be paid by the Indians. Senator Hayden's views appear in a 1937 memorandum of the Commissioner of Indian Affairs, who had talked to the Senator about the Act. We think this reliance on the Senator's view suffers from the same malady as the administrative interpretations previously discussed. Both occurred many years after passage of the Act; in fact, by 1937, the Administration officials had asked the sponsor of the Act (Senator Hayden) for his interpretation, while the Senator had asked these same officials for their interpretation. 33 Ind.Cl.Comm. at 25–26.

■ Furthermore, the views of an individual legislator, not expressed as part of or in the course of the legislative process, are entitled to little weight in ascertaining the intent of Congress. *Selman v. United States*, 498 F.2d 1354, 1359 n.6, 204 Ct.Cl. 675, 685 n.6 (1974) and cases cited therein.

That Congress did not specifically exclude the Indians from these charges is also not determinative of the case before us.[12] The Indians argue against this point by saying (were charges specifically in the Act) that subjecting them to such charges would have constituted a "taking."[13] We think it reasonable that Congress, intending to restore water to the Indians that was rightfully theirs, perceived no need to state that the Indians would not have to pay.

We also find unpersuasive the Government's contention that statutes prior and subsequent to the 1924 Act manifest the intent of Congress for that Act.

■ This court will not *imply* a requirement in the 1924 Act for the Indians to pay these charges just because prior statutes, *see* note 6 *supra*, contained *express* requirements for the Indians to pay similar operation and maintenance for *earlier* irrigation activities. *See People v. Valentine*, 28 Cal.2d 121, 169 P.2d 1 (1946).

■ Next, the Government has cited twenty-five acts passed subsequent to the 1924 Act which, it is claimed, demonstrate that Congress agreed with the Secretary of Interior that the Indians were liable for the operation and maintenance charges. These acts involve either the appropriation of reimbursable funds or the authorization of tribal farm revenues for paying the Indians' share of the operation and maintenance costs. We recognize it may be argued that such payments tend to ratify the Secretary's determination that the Indians should pay. *Brooks v. Dewar*, 313 U.S. 354, 360–61, 61 S.Ct. 979, 85 L.Ed. 1399 (1941). However, this inference is negated by the fact that Congress, in authorizing payment for the first year of these charges, also authorized the Indians to employ an attorney to advise them as to the legality of the charges. Act of August 9, 1937, ch. 570, 50 Stat. 564, 577. The later acts were of a

---

12.  *Cf. United Pacific Insurance Co. v. United States*, 497 F.2d 1402, 1405, 204 Ct.Cl. 686, 692 (1974).

13.  Under Arizona law, the first appropriators of water, in this case the Indians, have rights to the water paramount to rights of subsequent appropriators. Arizona law also requires that anyone diverting the water from its natural channel has a responsibility to deliver to the first appropriator the earlier amount of water at no expense. The Indians claim that any increased efficiency due to the Project inured to the benefit of non-Indian users of water. Thus they (the Indians) contend that to require them to pay for the water which was rightfully theirs under state law constitutes a "taking."

"housekeeping" nature and cannot be read, under these circumstances, to indicate an intent to ratify the regulation.

Therefore, combining the words of the statute with an analysis of all other pertinent arguments re intent, we are of the opinion that Congress did not intend (in the 1924 Act) to require the Indians to pay operation and maintenance charges for the water they received.

## III. DO ACTIONS BY GOVERNMENT AND INDIANS AFTER PASSAGE OF ACT PRECLUDE RECOVERY?

Moving to another argument, the Government urges that even if Congress did not intend for the Indians to pay operation and maintenance charges, the Commission erred in permitting these charges, *once paid*, to be refunded.

■ The defendant argues that Congress, in specifically authorizing each year the amounts complained of, exercised its plenary power over Indian funds and affairs, and therefore rightfully collected operation and maintenance charges. *See Choctaw Nation v. United States*, 91 Ct.Cl. 320 (1940), *cert. denied*, 312 U.S. 695, 61 S.Ct. 730, 85 L.Ed. 1130 (1941). Congressional authority exists to direct the use of Indian funds "for any purpose which it [the Congress] deemed for the best interest of the tribe, even though such use might not be in accordance with provisions of a prior treaty, agreement, or act of Congress . . . " 91 Ct.Cl. at 396.

■ Accepting the Government's position would require us to hold that, in effect, the intent of the 1924 Act is irrelevant, since it is argued that later authorizations of payments of the operation and maintenance charges preclude recovery under *Choctaw Nation, supra*. Such a position closely resembles the Government's ratification argument in Part II, *supra*, where we noted that the earliest act appropriating funds specifically recognized the existence of the controversy and even authorized payment for an

attorney for the Indians. We agree with the Commission that the subsequent acts were only of a *"housekeeping"* nature and cannot serve as sufficient authorization for the charges in light of the intent of the 1924 Act and the provision for the attorney in the 1937 appropriation.

■ The Government also maintains that the Indians, in authorizing the yearly payments by tribal resolution, "consented" to the charges. This argument, too, must fail, because the Indians continually objected to the charges beginning in 1934, and only agreed to pay after being threatened with a water cutoff. It appears that in 1937, and again in 1964, the Government actually carried out its threat to terminate the Indians' water. Payment under such circumstances cannot be considered "consent" by any stretch of the imagination.[14]

We therefore find no action by the Government or by the Indians after passage of the Act which precludes recovery.

## IV. INTEREST

■ The amounts in question here come from either (1) "Indian Moneys, Proceeds of Labor" (IMPL) funds, (2) "Individual Indian Money" (IIM) accounts, or (3) tribal commercial bank accounts. The Indians have sought interest at a rate of 4 percent per year. Interest as damages may not be awarded absent a treaty or statute specifically calling for interest to be paid. *United States v. Tillamooks*, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951); *United States v. Mescalero Apache Tribe*, 518 F.2d 1309, 207 Ct.Cl. 369 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). Such a statute exists for "Indian Moneys, Proceeds of Labor" (IMPL) funds, and we agree with the Commission that interest should be awarded for payments made from such funds. *See* 25 U.S.C. § 161b (1976).

However, no statute exists requiring interest to be paid on "Individual Indian Money" (IIM) accounts nor on tribal commercial

---

14. The Indians also did not "consent" (as the Government contends) to make payments from rental income for various land use permits, nor from proceeds of the tribal farm.

bank accounts. Therefore, under *Mescalero Apache, supra,* such interest as damages is clearly precluded.[15]

We hold that only interest on the monies paid from IMPL funds can be recovered.

In summary, we agree with the Commission and therefore affirm except for the amount of interest allowable. We have held today in *Navajo Tribes, supra,* that the Commission had jurisdiction for post-1946 damages where the claim had accrued prior to 1946. We have examined the 1924 Act and found that Congress intended Indians *not* to have to pay operation and maintenance charges. Neither later congressional acts appropriating funds to pay these charges nor tribal resolutions, passed under threats of a water cutoff, preclude the Indians from recovering. However, we can only award interest where a statute specifically allows for interest to be paid. Thus, the Indians can recover the monies wrongfully collected, plus interest on the amounts paid from IMPL funds, but with no interest on the amounts taken from IIM funds or tribal bank accounts.

Accordingly, we remand this case to our trial division[16] for such further action as may be needed consistent with this opinion.

NICHOLS, Judge, concurring:

I concur with and join in the court's opinion except for part I, headed POST 1946 JURISDICTION. My reasons for differing in part with today's opinion in the *Navajo* case are given with that opinion. Consistently, I also differ with citing and relying on it herein. I would hold, in terms of the 1956 *Gila River* decision, that the "wrong" to be righted was committed on promulgation of the Secretary's regulation complained of, before 1946, and the subsequent exaction of money from the Indians was "damages," in terms of that decision. Therefore, no issue of post 1946 accruals arises.

**15.** Two members of the Commission dissented on precisely this issue. 38 Ind.Cl.Comm. 37–39 (Yarborough, Comm'r, dissenting in part).

**16.** The Commission has been terminated as of September 30, 1978, and its responsibilities transferred to this court. *See Navajo Tribe v. United States,* Nos. 69, 299, 353, 586 F.2d 192 at 194 at n.1 (Ct.Cl. 1978).