GILA RIVER PIMA–MARICOPA
INDIAN COMMUNITY, et al.

v.

The UNITED STATES.

No. 236–C.

United States Court of Claims.

June 30, 1982.

Alfred S. Cox and Z. Simpson Cox, Phoenix, Ariz., for plaintiffs; Z. Simpson Cox, Phoenix, Ariz., atty. of record. Cox & Cox, Stephen L. Cox, Alan J. Cox, L. J. Cox, Jr., Phoenix, Ariz., Ira I. Schneier, Tucson, Ariz., Sandra L. Massetto, William R. Hobson, and Janet Keating, Phoenix, Ariz., of counsel.

George R. Hyde, Washington, D. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant.

Before DAVIS, BENNETT and SMITH, Judges.

## OPINION

PER CURIAM: *

Plaintiffs are a group of American Indians residing on the Gila River Indian Reservation in Arizona. They have standing to seek monetary relief from the United States under section 2 of the Indian Claims Commission Act, 60 Stat. 1050, 25 U.S.C. § 70a, which authorizes, among other grounds which may be relevant here, the filing of " * * * (5) claims based upon fair and honorable dealings that are not recog-

---

\* This opinion incorporates that of Trial Judge Merow, with modifications and deletions by the court after briefing and oral argument. The trial judge's findings of fact are adopted (but not printed herewith) as modified by our order of this date. Any finding contained in this opinion, not included in the formal findings of fact, shall also be considered a finding of the court.

nized by any existing rule of law or equity."[1]

In this litigation plaintiffs claim entitlement to compensation for the loss of that irrigation water from the Gila River which, it is asserted, they could have captured each year since 1868 and beneficially utilized on their tribal lands but which was, instead, diverted by upstream users.

The Gila River flows into Arizona from its headwaters in western New Mexico, then through the Duncan-Virden Valley, the Safford Valley and on through the broad valley plain of central Arizona to a junction with the Colorado River near Yuma, Arizona. Most of the Gila River basin in Arizona is a part of the Sonoran Desert. The hot, dry desert climate in this area is incapable of supporting more than a minimum of vegetation without the aid of irrigation. The level of precipitation is subject to substantial fluctuations. In dry periods the downstream surface flow of the Gila River could diminish to a trickle or vanish entirely, whereas during usually brief periods, rainfall can occur of a nature which can produce a substantial run-off of water over the desert soil resulting in heavy and damaging floods along the Gila River.

Plaintiffs have a long history of using the water of the Gila River to irrigate their lands to grow crops. The first non-Indians known to have explored this area were Spanish. Father Eusebio Francisco Kino, a Jesuit, made four expeditions into the Gila River area between 1694 and 1699.[2] By the late 1700's, reports by these explorers noted that the Pimas were irrigating their fields to grow crops. Before contact with the Spanish, maize was the principal Pima food crop. This was grown over the summer season and harvested in the fall. The Spanish introduced the Indians to wheat, a crop which could be grown over the winter. The Pimas and Maricopas also grew melons, pumpkins, squash and beans. Hunting and gathering also provided a substantial part of the food supply for the Indians and, in years when the Gila River water supply failed, reliance on wild plants and animal foods was intensified.

At the time of Kino's expeditions, the Pimas were thinly settled in villages extending about 53 miles along the Gila River. At certain points, underground rock "reefs" cut across the bed of the Gila River. These reefs serve to force any underground flow of water to the surface, and the early reported locations of several of the Pima villages bear a close relationship to these reef areas: locations where water would be available even when the bed of the Gila River elsewhere would be dry.

By the time Arizona came under United States sovereignty (1848–53) by means of the Treaty of Guadalupe Hidalgo (9 Stat. 922) and the Gadsden Purchase (10 Stat. 1031), the diaries and reports of travelers along the Gila River show that the Pima and Maricopa tribes had consolidated their area of residence from the 53 miles occupied during the Hispanic period to a solidly-massed and contiguous set of fields and villages extending for only 15 miles. The

1. Proceedings in this matter were originally commenced both before the Indian Claims Commission (Docket No. 236, petition filed in August 1951) and before this court (Docket No. 552–53, petition filed October 5, 1953). The action filed in this court was first suspended and then dismissed upon a ruling that the claims were within the jurisdiction of the Indian Claims Commission. *Gila River Pima-Maricopa Indians v. United States,* 135 Ct.Cl. 180, 140 F.Supp. 776 (1956), 157 Ct.Cl. 941 (1962). The particular claim asserted in this matter was then made the subject of a separate proceeding before the Indian Claims Commission where it was assigned Docket No. 236–C. Proceedings in Docket No. 236–C were transferred to the Court of Claims on July 13, 1978, 42 Ind.Cl.Comm. 202.

2. Archaeological evidence indicates that during prehistoric times, from the beginning of the Christian era to 1450 AD, the middle Gila River valley was occupied by a civilization known as the Hohokam. The Hohokam constructed a remarkable and extensive system of irrigation canals for use in growing crops. However, this civilization disappeared sometime before the arrival of the first non-Indian explorers. Differing explanations have been offered for this disappearance, such as a failure of the irrigation system, an inability to cope with periods of drought and flood, and the arrival in the area of hostile nomadic invaders, perhaps Apaches.

area involved was centered on land in the vicinity of the present Casa Blanca, Arizona. This concentration occurred primarily in response to raids by surrounding hostile tribes, particularly the Apaches.

The Americans who first contacted the Pima-Maricopas, such as military expeditions and travelers to California, were all favorably impressed with the scale of agriculture in which the Indians were engaged, including the system of irrigating the fields. These fields consisted of rectangles of 150 to 200 feet on a side, bordered so that each field could be flooded separately, and fenced to keep out animal pests. Each field was approximately one-half acre with an irrigation ditch for every six fields. The point of diversion of water from the Gila River was located upstream where, in prehistoric times, the Hohokam had commenced a major canal called the "Little Gila Canal." This was at a point in the Gila River where an underground "reef" would then force water to the surface even during dry periods. Diversion was accomplished by use of a frail dam structure consisting of poles tied together with bark and rawhide with stakes driven into the bed of the river. Small crevices were filled with bundles of willow branches, reeds and a weed called "gatuna." Such dams would seldom last for a year and were often carried away when floods would occur.

With the advent of United States control over the area in which the Pima-Maricopas had their fields and villages, the Indians were most interested in obtaining assurances concerning the tenure of their lands. All responsible persons who then investigated the situation recommended that the Pima-Maricopas should be allowed to retain the locations they occupied. For example, in November of 1858, Godard Bailey, Special Agent, Indian Department, submitted a report and recommendation, stating (in part):

These Indians have strong claims upon the consideration of the United States government, the prompt recognition of which not only justice and humanity, but sound policy, renders a matter of prime necessity. From the time they refused to assist the Mexicans in cutting off Colonel Cook's command in 1847, they have been loyal to us: supplying grain and forage to emigrant and mail parties; aiding them in recovering their cattle, strayed or stolen by the Apaches, and manifesting in every possible mode their desire to maintain friendly relations with us.

\* \* \* \* \* \*

But it is necessary to do more than conciliate these Indians by presents. They must be secured in the possession of their lands. Their richness and their advantageous location will excite the cupidity of a class of settlers not over nice in their regard for the rights of the Indians, and trespasses will be committed which will surely be resented and punished. Domestic in their habits, occupying fixed habitations, attached to the soil they and their ancestors have cultivated for ages, these are precisely the people who will least brook an invasion of their territorial rights.

\* \* \* \* \* \*

They are a barrier between the Apaches and all western Arizona, and while their present relations continue, travel between Fort Yuma and the Maricopa wells, will be as safe as in the settlements.

Congress responded to the concerns of the Pimas and Maricopas by enacting legislation (Act of February 28, 1859, 11 Stat. 388) authorizing and requiring that a tract of land not to exceed 100 square miles (about 62,000 acres) be surveyed and set aside for these Indians. This act also appropriated $10,000 for presents to the Pimas and Maricopas in recognition of the many kindnesses rendered by them to United States citizens. A survey party was established and, in initial meetings with the Pimas and Maricopas, the Indians claimed the entire Gila Valley for a distance of some 100 miles. The officer in charge of the survey explained to the Indians that the tract authorized was intended to enclose their present villages and planting grounds, and mark them with boundaries to prevent encroach-

ments by American settlers and others. The Indians were assured that if they held a valid title to any lands beyond the survey then authorized, it would be a matter for future consideration by the Government, and that full justice would be done by the United States Government in this and every other respect.

Because of the 100 square mile limitation and the fact that the lands occupied by the Pima-Maricopas were somewhat downstream from the point on the Gila River where water for irrigation was diverted, it was not possible to include this diversion point in the reservation. Also not included were the so-called "Blackwater" lands upstream in the vicinity of Casa Grande where underground rock reefs forced water to the surface at all times of the year. These limitations on the extent of the reservation prompted comments by Government officials such as that submitted to the Commissioner of Indian Affairs by Special Agent Silas St. John on January 18, 1860, as follows (in part):

> Should the land immediately above them be occupied it would be necessary to procure water from the river Gila for its cultivation; at a low stage of the river this would deprive the Pimos [Pimas], which would undoubtedly be a fruitful source of contention and difficulty unless some law be made for the use of the water as in all sections of the country where water is used for irrigation purposes. * * *

The outbreak of the Civil War delayed settlement of the Arizona territory, but by 1864 conditions favorable to continued settlement had been restored. In June of 1864 the resident trader at the Pima villages reported that the Indians would have a surplus wheat crop over that needed for consumption of in excess of one million pounds. The Indians used this surplus to purchase items which they required. In fact, from the time the Pima-Maricopas were first visited by substantial numbers of Americans, they were, except in drought periods, raising more crops than they were consuming. With this surplus, the Indians operated what one of plaintiffs' expert witnesses in this litigation, Henry F. Dobyns, characterized as " * * * a roadside store of unprecedented magnitude." Trading was undertaken with military units, travelers and a stagecoach line which was established in 1858 to provide transportation from St. Louis to San Francisco via the Gila River.

After 1868 the increasing number of settlements upstream from the Pima-Maricopa lands resulted in expressions of concern by those Government officials responsible for Indian matters. An extension of the reservation to incorporate the point of diversion for the Little Gila Canal was proposed. After an inspection trip in March of 1869, General Thomas C. Devin, Superintendent of Indian Affairs for Arizona, noted upstream ground being cleared for ranches and observed in his report:

> The water is now being rapidly diverted from the Gila into the many acequias required for the irrigation of the Settlement at Florence, and if a dry season should intervene the Pimas and Maricopas will be without water for their farms. In such a case they threaten to "clear out" the settlers whom they contend are stealing their water, and have during the past season shown their hostility to an extent that nearly forced a collision; riding down and destroying the crops and appearing to court a difficulty.

By 1870 there were some 2,000 acres under irrigation by non-Indians upstream from the reservation in the Florence-Casa Grande area. The three years of 1871–73 constituted the first dry period which occurred after the beginning of upstream diversions on the Gila River, and the resident agent reported some crop failure on the reservation due to lack of water. A substantial number of the Pimas and Maricopas left the reservation to cultivate lands along the Salt River where water was available. Several possible solutions to the water shortage were considered, including extending the reservation to incorporate the upstream settlements, building Government-controlled canals to see to a fair diversion of the water supply and relocating the Pimas and Maricopas.

The return of sufficient precipitation and abundant crops in 1874 ended discussion of relocation of the Indians, and in 1876 an additional 10,300 acres were added to the reservation by Executive order (1 Kappler 806), including the Blackwater area and the diversion point for the Little Gila Canal.[3] Drought conditions returned in 1877 with crop failures occurring, but adequate water conditions returned in 1881 with no serious reoccurrence of drought conditions until 1893.

In 1866 the resident Indian agent called the attention of the Department of Interior to the proposed construction of a new canal above Florence, Arizona by the Florence Canal Co., which it was considered would constitute a serious threat to Indian agriculture downstream. This problem was, in turn, referred to the Department of Justice and a report was obtained from the United States Geological Survey which confirmed that the water available to the reservation " * * * under present conditions is no more than sufficient for the Indians, and that a larger amount could be used to advantage; * * *." To obtain any larger amount of water, it was noted, would require the construction of an upstream dam and a canal distribution system. Construction of such a "storage" system was suggested by the Government resident agents in 1888 and 1890. No action was taken by the Department of Justice to curb diversion of water by the Florence Canal Co. beyond obtaining a commitment from the company not to use its canal in a manner such as to deprive the reservation of any of its existing rights in the water of the Gila River for irrigating purposes.

By 1893 the problem of upstream diversions had become further complicated by the increase in settlement activity much further upstream on the Gila River in the Safford-Solomanville district. In 1893 there were some 6,003.31 acres in the Florence-Casa Grande area and 18,240 acres in the Safford Valley under irrigation facili-

ties. The Pimas and Maricopas adjusted to a diminished water supply by relocating their crops to areas on and off the reservation where water was available, but crop failures occurred nevertheless from lack of water.

Commencing in November of 1895, an expert from the United States Geological Survey, Mr. Arthur P. Davis, was assigned to make an investigation of the water supply for the Gila Indian reservation. Mr. Davis reported (in part):

The fact that the waters of the Indian Reservation have been materially decreased by the construction of the Florence Canal is unquestioned. This having been permitted, the solution of the problem for a time seemed to depend upon legal action to prevent the diversion of the waters by this canal. Subsequent events, however, have altered the aspect of the question from the fact that the supply for the Florence Canal itself is now short, owing to diversions for irrigation far above that point, chiefly in Graham and Cochise Counties, Ariz.

Noting that, in his view, it was not practical to eliminate depletions far upstream, Mr. Davis recommended the appropriation of $2,244,000 for the construction of a storage reservoir and dam at an upstream site known as The Buttes. Further investigations based upon Mr. Davis' work were carried out by Mr. J. B. Lippincott who also concluded, in a report submitted in December of 1899, that a storage dam should be constructed. Mr. Lippincott's work indicated that the site at The Buttes would not be desirable because of the nature of the underlying rock and he recommended that the construction take place at San Carlos, some 60 miles further upstream.

Water for crops on the reservation did flow during the years 1897–98, but serious drought conditions returned in 1899 and lasted through 1904. This period constituted the years of most severe deprivation the Pimas and Maricopas were reported to have

3. Subsequent Executive orders enlarged the reservation to its present area comprising 372,-000 acres.

encountered. The resident Indian agent reported that they had become destitute. The President appointed a committee to investigate the condition and needs of the Indians and in 1904 this committee submitted its report, noting that the then lamentable condition of the tribe had been brought about by the deprivation of their water supply, the decreasing amount of wood which they were permitted to cut (an alternative source of income on the reservation) and the lack of available means of support within reach of their homes. The committee recommended that a pumping plant system be installed to use groundwater for irrigation purposes on the reservation and, if this should prove to be inadequate, Congress then be requested to appropriate funds for the construction of a storage reservoir to conserve the flood waters of the Gila River.

Also in 1904, the question of instituting litigation against upstream diversions was considered. The United States attorney for Arizona noted that some 960 persons were then using water from the Gila River at points as far as 200 miles above the reservation. Both the Department of Interior and the Department of Justice concluded that, because of the problems involved with enforcing any decree obtained, litigation would not secure the water the Indians required.[4] No suit was instituted.

In 1905 flood conditions on the Gila River ended the preceding years of drought. Also, by the Act of March 3, 1905, 33 Stat. 1081, Congress appropriated $50,000 to begin an irrigation project on the reservation to provide sufficient water for 10,000 acres. This project, known as the Santan Ditch, would utilize groundwater obtained by pumping.

In 1912 Congress directed the Secretary of War to convene a board of Army engineers for the purpose of examining the practicability of constructing a dam and reservoir on the Gila River at San Carlos, together with the necessary irrigation works to provide for the irrigation of Indian, private and public lands in the Gila River Valley. The report, as submitted in 1914, contemplated a large impounding dam across the Gila River at San Carlos, a diversion dam across the Gila River at a point 10 miles above Florence, and a main canal or canals from the point of diversion to the lands southwest of Florence and to the reservation. The board noted that, because the flow of the Gila River reflected long drought periods, sufficient capacity was needed to provide holdover storage. Based upon available data, the board concluded that, at a cost of some $4,581,235, a gross area of 90,000 acres could be irrigated by water from this project, of which some 40,000 acres would be Indian lands on the Gila River Reservation.

The board's 1914 report recommended constructing the San Carlos project even if the cost were considered to be high. The report noted that, beyond cost, other considerations were involved such as (in part):

207. Some of the benefits to result from carrying out this project and some of the incentives for the United States to proceed with it can not be expressed in dollars and cents. Thus, there is the plain duty of restoring the water of which the Indians for many years have been illegally deprived; the obligation, growing out of the relation of a guardian, to supply even a better system of water supply than that formerly enjoyed in order to permit proper opportunity for development and advancement of the Indians; and finally the advantages of conserving water which otherwise would largely be lost, and of utilizing it upon these desert lands, both Indian and private, thus adding materially to the producing power of the State and providing additional profitable industries to the people.

\* \* \* \* \* \*

4. In 1901 the United States attorney had been successful in a suit instituted against settlers who attempted to appropriate water from the Maricopas on the western end of the reservation. However, the canals involved in this prior suit covered land in a compact body immediately adjoining the Indians' cultivated fields.

216. The irrigation facilities provided under this project will excel any ever before enjoyed by the Indians, and to that extent the project might seem a gratuity to the Indians. But in dealing with this question it is not more important to right the wrong of the past than to provide for the future advancement of this tribe. There is no other way to effect a satisfactory and permanent solution of the long-standing Pima question.

Further investigations questioned whether the full San Carlos project should be constructed or whether, as an initial step, two diversion dams only should be constructed. The construction of permanent diversion dams would provide a substantial benefit in that they would replace the use of temporary brush dams which would wash out in each flood, resulting in the loss of needed diversion capacity when water was available. Accordingly, the Act of May 18, 1916, 39 Stat. 123–32, provided for the construction of two diversion dams, one at Florence above the reservation, and one on the reservation at Sacaton. The Florence dam was to be constructed as a part of a project for the irrigation, from the natural flow of the Gila River, of Indian lands on the reservation and private and public lands in Pinal County. Commencement of this Florence-Casa Grande project was delayed by World War I and by the complex negotiations necessary to obtain agreements by private owners whose lands were to be included.

As the Florence-Casa Grande project was established, it was determined that 62,000 acres could be included, 35,000 Indian and 27,000 non-Indian. A formula for allocating the available Gila River water was negotiated which provided that: of the first 300 second-feet or less, 60.6 percent would go to Indian land and 39.4 percent to private land; of the second 300 second-feet or less, 51.7 percent would go to Indian land and 48.3 percent to private land; in excess of 600 second-feet, 56.1 percent to Indian land and 43.9 percent to private land. The Government's negotiators considered this agreement to be " * * * better than any-

thing that litigation could give * * *." The Florence dam, named the Ashurst-Hayden Dam, was completed on June 30, 1922, and the Sacaton dam and bridge were completed in June of 1925.

The success in obtaining the Florence-Casa Grande portion of the San Carlos project (the two diversion dams) stimulated additional efforts to obtain legislation authorizing the remaining part, the large storage dam at San Carlos. By the Act of June 7, 1924, 43 Stat. 475, construction of the San Carlos storage dam was authorized.

In authorizing the over $9 million cost of the San Carlos project, it was assumed that sufficient natural river flow, stored water and pumped groundwater would be available for the irrigation of about 100,000 acres of land—50,000 Indian and 50,000 non-Indian. The 62,000 acres of the Florence-Casa Grande project were to be included. The reservoir created by the 250 foot high San Carlos dam was to have the capacity to store 1,285,000 acre-feet of water. The electrical generating capacity of the San Carlos dam was to be used, in part, to power pumps to obtain groundwater needed by the project lands as a supplement to that available from the Gila River. The dam, named for President Coolidge, was completed in November 1928 and the first release of water for irrigation occurred early in 1929.

In connection with administering the San Carlos project, it was recognized that a determination of all rights to the use of the water involved would be required and, on October 2, 1925, the United States instituted an action in the United States District Court for the District of Arizona (Globe Equity No. 59) against all non-Indian users of Gila River water, from the Duncan-Virden Valley to the reservation. A determination as to all diversion rights was sought. After 10 years of litigation, in 1935 a proposed consent decree was submitted for court approval based upon a stipulation of settlement executed on behalf of the United States by, among others, Homer Cummings (the then Attorney General) and Ha-

rold L. Ickes (the then Secretary of Interior).[5]

In Globe Equity No. 59, a complex decree was entered by the court on June 29, 1935. For all lands covered, the decree provided for a duty of water for each irrigation season not exceeding six acre-feet, at the point of diversion, for each acre and provided that the diversion rate could not exceed $\frac{1}{80}$ of a cubic foot per second for each acre of land.[6] The decree also established that one of the rights possessed by the United States on behalf of the Pimas and other Indians of the Gila River Indian Reservation was:

> * * * to divert 210,000 acre-feet of the waters of the Gila River during each irrigation season, from the natural flow in said river at the Ashurst-Hayden and Sacaton diversion dams—as of an immemorial date of priority and to the extent that such waters are available under said priority—at a rate of diversion not exceeding 437.5 cubic feet per second at any time during such season for the reclamation and irrigation of the irrigable Indian allotments on said reservation, which amount to 49,896 acres, as they are or hereafter may be made, and of the administrative area on said Reservation which amounts to 650 acres, to the extent that the herein described water right, which is sufficient for and limited to the needs of 35,000 acres, will reclaim and irrigate the same * * *.[7]

The United States Geological Survey has reported the Gila River flow, below the site where the Coolidge Dam was constructed, since 1899. During the period between 1899 and November 1928, when Coolidge Dam began to regulate the flows, runoff averaged about 460,000 acre-feet per year. The average runoff for the period 1929 to 1967 was about 215,458, or 53 percent less. Because, since 1929, less water has been available in the Gila River watershed than was anticipated on the basis of the past record, the San Carlos project has not been able to deliver all the water that it was designed to provide. Since 1929, a substantial portion of the water provided on the reservation has been obtained by pumping. While there are 167,846 acres (including allotted and unallotted acres) on the reservation which could be irrigated if water were available at an economical rate, sufficient water has not been available to justify subjugating the full 50,000 acres contemplated by the San Carlos project. On an average basis, over 21,000 Indian acres have been irrigated yearly on the San Carlos project, using the facilities which have been built pursuant to a series of enactments which, essentially, commenced with legislation authorizing the Santan Ditch project in 1905.

Prior to the construction of any major irrigation facilities by the United States on the Gila River, when the Pimas and Maricopas had both the unrestricted use of what-

5. On June 25, 1935, the Pima Indian Tribal Council moved for permission to intervene in Globe Equity No. 59 to assert that, with respect to low flows of the Gila River, " * * * said consent decree is contrary to the law of the United States, the Acts of Congress approved May 18, 1916, and June 7, 1924, and all agreements heretofore entered into by and between the Secretary of the Interior, the Indians and the whites, and the San Carlos Federal Irrigation Project in Arizona." The United States opposed intervention, asserting that the Indians were already parties and that the consent decree conformed to the prior legislation and agreements. The petition for intervention was denied by the court.

6. An "acre-foot" is the volume of water which would cover one acre one foot deep and is

equal approximately to 325,850 U.S. gallons. A flow of $\frac{1}{80}$ cfs would provide one acre-foot of water in $40\frac{1}{3}$ days and would deliver 6.0 acre-feet of water in 242 days. The water delivery rate is, therefore, related to the need for water during a normal irrigation season of eight months.

7. In July and August of 1914 formal allotments of reservation land were made to individual Pima-Maricopa Indians under section 17 of the Act of June 25, 1910, 36 Stat. 855, 859–60. Some 9,090 acres were then so staked and the process continued until, by June of 1920, some 96,000 acres on the reservation were allotted. Each Indian received two 10-acre allotments, a primary allotment with a water right and a secondary allotment regarded as nonirrigable.

ever water they could capture from the natural flow of the Gila River (undiminished by upstream diversions) and a good demand for their surplus crops, these Indians had some 12,000 to 15,000 acres under canals, of which no more than 7,000 to 8,000 acres were cultivated in any one year. Accordingly, the irrigation projects constructed for the Pimas and Maricopas, which were commenced in 1905, have served to place under irrigation substantially more lands on the reservation than the evidence presented in this litigation has demonstrated could ever have been irrigated, absent these facilities, with the erratic natural flow of the Gila River undiminished by upstream diversions.

In the above circumstances, it is first necessary to resolve the extent of any obligation or duty of the United States to preserve the Pimas' and Maricopas' water supply.

Defendant argued below that the United States had no duty to insure the Pimas and Maricopas against any loss of irrigation water caused by third-party upstream diversions. This is because, it was asserted, no agreement, statute, treaty, or Executive order exists which established such a specific obligation on behalf of the United States. *See Gila River Pima-Maricopa Indian Community v. United States*, 190 Ct.Cl. 790, 427 F.2d 1194, *cert. denied*, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). Plaintiffs respond by asserting that the question, under the Indian Claims Commission Act, is not whether the United States insured that the reservation's water supply would be preserved but, in protecting this tribe's asset, " * * * Did the Federal Government do whatever it was required to do, in the circumstances * * *." *Oneida Tribe of Indians of Wisconsin v. United States*, 165 Ct.Cl. 487, 494 (1964), *cert. denied*, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964). Plaintiffs assert that the United States did not do what it was required to do to comport with a standard of fair and honorable dealing.

This case does not present the more typical situation in the late 1800's involving the assignment of a nomadic Indian tribe to a reservation, often created in an arid region, with the goal of changing the members' habits so as to cause them to become a pastoral people. *See Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). When they came under United States sovereignty, the Pimas and Maricopas were a self-sufficient, pastoral people with entrepreneurial abilities, and the reservation which was established in 1859 was intended to preserve their favorable status by rendering them secure in the possession of the lands which their villages and irrigated farms had long occupied. Subsequent enlargements of the reservation by Executive order protected additional crop and grazing lands together with areas containing mesquite, a source of food and fuel. The essential purpose for the creation of the Gila River Reservation was to protect the areas used by the Pimas and Maricopas from incursions by settlers, so that the Indians could maintain their already existing livelihood. The protection from hostile tribes and other assistance which the friendly Pimas and Maricopas provided to persons in the territory, and the surplus wheat they had for barter or sale, were of value to the United States and these benefits formed the basis for the recommendations which were made to establish the Gila River Reservation. From the beginning it was also recognized that, for the Pimas and Maricopas to remain self-sufficient, the water supply which they were using for their crops would have to be protected and diversions upstream on the Gila River could interfere with their requirements during dry periods of low river flow. Once harmful upstream diversions commenced, the United States promptly recognized the need to provide a solution to the problem but did not begin to take effective action for some time. This was after the Pimas and Maricopas had, for periods of time, lost their ability to be totally self-sufficient because of the lack of a dependable water supply for their crops, a situation which was pri-

marily due to upstream diversions of water.[8]

Accordingly, the actions taken by the United States in establishing the reservation in 1859 and in enlarging it thereafter, together with repeated recognition of the need to preserve or restore the water supply utilized by the Pimas and Maricopas in maintaining their commendable self-sufficient status, are consistent only with the existence of a special relationship between these Indians and the United States concerning the protection of their lands and the water supply they utilized on these lands.

 It is concluded that, as in the case with the timber involved in *Oneida Tribe of Indians of Wisconsin v. United States, supra,* the United States could not honorably and fairly avert its face from the continuous loss of water suffered by the Pimas and Maricopas. Reasonable action was required to end the loss or to provide an equivalent supply. *Northern Paiute Nation v. United States,* 225 Ct.Cl. ——, 634 F.2d 594 (1980).

Plaintiffs argue that the United States was required to file suit promptly to enjoin upstream diversions when they occurred, whereas defendant, in rejecting any such obligation, relies upon the contemporaneous opinion of those concerned with initiating such litigation that this approach would not then have been effective against diversions which extended several hundred miles upstream from the reservation. It was not until the full San Carlos project was finally authorized that defendant instituted litigation to resolve water rights along the Gila River and this proceeding (Globe Equity No. 59) involved allocating the increased water supply which the San Carlos project was expected to generate. Because prior to 1925 major litigation was not attempted as a solution to the upstream diversion problem, one can only speculate whether this approach, used earlier, would have produced

water for the Indians or whether Senator Hayden's view, in opposition to litigation, that it " * * * would not give the Pima lands as much moisture as was to be found in the ink of the signature of the judge who would sign such a decree" was correct.

However, litigation was not the only method available to meet the problem presented when upstream diversions commenced. As discussed previously, early recommendations were made to construct facilities which would control the flow of the Gila River. Except as necessary to comport with the standard of fair and honorable dealings with the Pimas and Maricopas, by either protecting their existing water supply or providing an equivalent alternative supply, the United States had no obligation to construct irrigation works for these Indians. *American Indians Residing on the Maricopa-Ak Chin Indian Reservation v. United States,* 31 Ind.Cl.Comm. 384 (1973); *but see* Pub.L. No. 95–328, 92 Stat. 409. If adequate storage and diversion dams were constructed, the flood waters of the Gila River could be captured and this would provide a quantity of water which was otherwise lost downstream. Floods on the Gila River would often occur during months when irrigation was not needed and would wash out the existing brush diversion dams, preventing the capture of water even when it was needed. Absent a substantial investment in the permanent facilities required to control, effectively, the Gila River flow, only a small portion of the water present on an annual basis could be captured and utilized for irrigation. When the Pimas and Maricopas had the full natural flow of the Gila River, prior to any significant upstream diversions and also had a good demand for whatever surplus crops they could harvest, they were able, often using the full flow available to them, to cultivate only up to some 7,000 to 8,000 acres in any one year. (This is the finding of the trial judge which we have no adequate reason to upset.) On

---

8. Defendant has urged that the diminished water supply on the reservation was due to other causes such as changes in climate, stream bed and vegetation. These situations occurred and were undoubtedly factors in the lessened supply of water, but the primary cause must be assigned to upstream diversions on the basis of the evidence presented in this matter.

the basis of the average flow of the Gila River, this indicates an average annual requirement of 58.5 to 66.9 acre-feet of natural Gila River flow for each acre they so cultivated. Controlling the river flow and providing for storage of the flood waters had the advantage of, in effect, creating new water for irrigation such as to permit the continued settlement of the upstream Gila River valley, while still providing a water supply for the reservation. Also, by developing a groundwater pumping system, still more water could be made available.

The record evidence is clear, however, that private or Indian capital was not available to build the facilities needed to develop groundwater irrigation or to control the Gila River flow. In fact, based strictly upon economic considerations, such a project was not deemed to be feasible.[9] Construction by the Government was continually recommended, however, as an alternative to proceedings to compel the end of upstream diversions which, if successful, would also result in the destruction of the then existing settlements along the Gila River which also depended upon the water for their livelihood.

■ Accordingly, it is concluded that, to comply with the standard of fair and honorable dealings, it was incumbent upon the United States, once upstream diversions began to restrict the Pima and Maricopa agriculture, to take legal action either to attempt to end the diversions[10] or to restore an alternative equivalent supply if diversions were to continue for reasons of public policy in favor of settlements.

■ It is further concluded that until 1905 the United States did not take reasonable action to restore an alternative equivalent water supply to the Pimas and Maricopas. Commencing with the 1905 Santan Ditch project, defendant did then and thereafter do all it was required to do, under its special relationship with the Pimas and Maricopas, to restore an equivalent source of water for irrigation so as to enable these people to again become self-sufficient. As discussed previously, using the facilities provided by the United States since 1905, substantial additional reservation acres have been irrigated each year as compared to the number of acres which the proof presented in this matter shows could have been farmed each year, absent both upstream diversions and the improvements provided by the United States.

■ Plaintiffs press upon us that the trial judge erred in holding that the Government did not fail to act fairly and honorably after 1905. We cannot agree. The trial judge permissibly found, as we have stated above, that when the Indians had the full natural flow of the Gila River, prior to any significant upstream diversions, and also had a good demand for whatever surplus crops they could harvest, they were able, often using the full flow available to them, to cultivate only up to some 7,000 to 8,000 acres in any year. We do not think that the Government was under the obligation, under the fair-and-honorable-dealings clause, to do anything more than to restore the Pimas and Maricopas to that pre-diversion standard—i.e., to have enough water so that they could cultivate the 7,000 to 8,000 acres they had been cultivating, with success, before the settlers began significant diversions of the water. The Government might itself undertake to do more, but it was not required to do so by any moral or legal standard embodied in the Indian

---

**9.** Because the San Carlos project, at a relatively high cost, has not provided all of the water it was expected to produce, it has sometimes been referred to as a "white elephant." *See Gila River Pima-Maricopa Indian Community v. United States*, 38 Ind.Cl.Comm. 1, 4 (1976), *reversed in part*, 218 Ct.Cl. 74, 586 F.2d 209 (1978).

**10.** Under applicable local law, as the initial appropriators of water, the Pimas and Marico-

pas had paramount rights. *United States v. Gila River Pima-Maricopa Indian Community*, 218 Ct.Cl. 74, 586 F.2d 209 (1978). After 1908, the doctrine of reserved water rights could be asserted to the extent the resource was necessary to provide the Pimas and Maricopas " * * * with a livelihood—that is to say, a moderate living." *Washington v. Fishing Vessel Assn.*, 443 U.S. 658, 686, 99 S.Ct. 3055, 3075, 61 L.Ed.2d 823 (1979).

Claims Commission Act. The trial judge has found that by 1905 the defendant seriously undertook to fulfill that obligation, and we are not persuaded that any later date should be substituted. There is some evidence that it may have taken some years for defendant to complete fulfillment of its obligation, but we cannot say, on what is before us, either that the trial judge had to accept that evidence as conclusive or that any such delay was necessarily or probably the fault or responsibility of the Government.

■ Plaintiffs also urge, apparently as a legal claim, that they are entitled, at the maximum, to sufficient water each year to irrigate all the practicably irrigable acres of their reservation. As there exist 167,846 acres on the reservation which are irrigable (if water were available), plaintiffs multiply these acres by the 6 acre-feet per year "duty" utilized by the District Court in the 1935 Globe Equity No. 59 decree to claim maximum entitlement to at least 1,007,076 acre-feet of water each year (an amount somewhat greater than the entire flow of the Gila River except in several peak flood years). Plaintiffs' position is based upon the so-called Winters doctrine which stems from the decision in Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). That case ruled that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, such as an Indian reservation, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In Winters, the court sustained an injunction barring those diversions by upstream landowners which would have deprived the Fort Belknap Reservation of water needed to change the nomadic habits of the Indians assigned to the reservation so as to cause them to become " * * * a pastoral and civilized people." 207 U.S. at 576, 28 S.Ct. at 211. In Arizona v. California, 373 U.S. 546, 83 S.Ct.

1468, 10 L.Ed.2d 542 (1963), the question of water reserved under the Winters doctrine was measured by irrigable acres. In Washington v. Fishing Vessel Assn., 443 U.S. 658, 685–86, 99 S.Ct. 3055, 3074–75, 61 L.Ed.2d 823 (1979), the Supreme Court, in discussing the Winters doctrine, noted:

> In those cases, after determining that at the time of the treaties the resource involved was necessary to the Indians' welfare, the court typically ordered a trial judge or special master, in his discretion, to devise some apportionment that assured that the Indians' reasonable livelihood needs would be met.

> * * * * * *

> As in Arizona v. California and its predecessor cases, the central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living.

See also United States v. New Mexico, 438 U.S. 696, 698–701, 98 S.Ct. 3012, 3013–15, 57 L.Ed.2d 1052 (1978).

We do not decide whether the Pimas and Maricopas fall under the full Winters doctrine; their reservation may have been established to preserve what they had, not to change their habits from nomadic to pastoral, and this distinction could conceivably make a legal difference. But even if Winters applies fully to plaintiffs, we hold that, for monetary compensation on account of pre-August 1946 injuries under the Indian Claims Commission Act,[11] these Indians are not entitled to damages for the failure of the defendant to supply them with all the water necessary to irrigate all the practicably irrigable acres of their reservation. The reason is that, as we have found, (a) the Indians were not in fact using more than 7,000 to 8,000 acres even when they had the full natural flow of the Gila River, and (b) they did not have the ability (i.e. capital) to

---

11. The other cases applying Winters have involved injunctive, declaratory, or other affirmative relief, including apportionment of re-

sources, for the future. That type of case, primarily concerned with future water use, plainly involves different considerations.

build the facilities necessary for greater irrigation or to control the Gila River flow—in other words, they were unable to use more water than enough to cultivate 7,000–8,000 acres. The Indian Claims Commission Act, the aim of which was to grant monetary compensation for past (pre-August 1946) wrongs actually inflicted by the United States, does not call for damages based on theoretical maximum "rights" that the Indians were wholly unable to utilize and to implement at the time, especially where the Government was under no moral or legal obligation to construct new facilities so that the Indians could then use the greater amount of water they now claim.[12]

As for the later period (after the Government had planned and proceeded to construct the Santan Ditch and the San Carlos project), we have already held that the Government could proceed through litigation, as it did in Globe Equity No. 59. The 1935 judicial decree in that case established the extent of plaintiffs' right to the water made available by the extensive facilities of the San Carlos project.[13] There is no proof in this proceeding that these court-established rights have not been enforced since 1935. Plaintiffs do contend that the decree improperly gave up some of the Indians' pre-existing rights. But there is no sufficient showing in this case that the decree, which was a compromise or settlement, was unfair to the Pimas and Maricopas. Nor do we construe the decree as an abandonment by the Government of clear Indian rights.

The mere fact that the decree may have given up some rights previously *claimed* by the Indians does not vitiate the compromise—that is the nature of most consent decrees based on compromise and settlement.

Accordingly, plaintiffs' claim of entitlement to monetary compensation based upon a claimed right to 1,007,076 acre-feet of water each year must be rejected. Likewise, defendant's position that no liability exists has been rejected. The trial judge proceeded to decide the general extent of liability on a yearly basis (grounding his ruling on the figures he determined for lost crops for the years 1872–1904). We do not, however, adopt that ruling or computation. The issue of damages was not truly tried below, and the parties may not have presented all their evidence and contentions. We think that they should now have the opportunity to present evidence and arguments on the extent of the damages due to the Government's liability we have found above in this opinion for the period ending in 1905.[14] The case will be remanded to the Trial Division for that purpose.

## CONCLUSION OF LAW

Plaintiffs are entitled to recover from the United States as provided in the foregoing opinion, and the case is remanded to the Trial Division to determine the amount of such recovery under Rule 131(c).

---

12. Our conclusion is entirely consistent with the ruling of the Indian Claims Commission, at an interlocutory stage in this proceeding, that the plaintiffs were entitled to divert, in any given year, "only the amount of water which could be put to beneficial use on [the Indians'] lands in that year." *Gila River Pima-Maricopa Indian v. United States,* 29 Ind.Cl.Comm. 144, 168 (1972). *See also* 29 Ind.Cl.Comm. 144, 158. The Commission did *not* hold that plaintiffs were entitled to recover damages on the basis of the water needed to irrigate all the reservation land, whether or not plaintiffs could actually put it to beneficial use.

13. In sending this case to trial, the Indian Claims Commission ruled that the Gila River Decree in Globe Equity No. 59 has no *res judicata* or collateral estoppel application to the instant litigation. 29 Ind.Cl.Comm. 144, 163–

66 (1972). The Commission did accept as presumptively correct that portion of the decree which set forth plaintiffs' entitlement to divert up to 210,000 acre-feet of water per year when this was available under the terms of the decree, but ruled that, in all events, plaintiffs were entitled to divert from the Gila River only the amount of water which could be put to beneficial use on their lands. *See* note 12, *supra.*

14. Because no liability is found to extend to years after 1905, it is not necessary to deal with the question whether the claim presented in this matter is individual or tribal, in whole or in part. Lands on the Gila River Reservation were not allotted to individual Indians prior to 1914.