964 F.2d 1102
 The CONFEDERATED TRIBES OF the COLVILLE RESERVATION,
Colville, Lake, Sanpoil-Nespelem, Okanogan, Methow,
Columbia, Wenatchee, Chelan, Entiat, Palus, and Joseph's
Band of the Nez Perce Indians, Plaintiffs-Appellants,
v.
The UNITED STATES, Defendant-Appellee.
 No. 90-5099.
 United States Court of Appeals,
Federal Circuit.
 April 29, 1992.
Rehearing Denied June 17, 1992.
 
 Harry R. Sachse, Sonosky, Chambers & Sachse, Washington, D.C., argued, for plaintiffs-appellants. With him on the brief were Anne D. Noto and I.S. Weissbrodt.
 Andrew C. Mergen, Dept. of Justice, Washington, D.C., argued for defendant-appellee. Richard B. Stewart, Asst. Atty. Gen., Edward J. Passarelli, John A. Bryson and J. Carol Williams, Attys., Dept. of Justice, Washington, D.C., were on the brief, for defendant-appellee.
 Before NIES, Chief Judge, BENNETT, Senior Circuit Judge, and PLAGER, Circuit Judge.
 BENNETT, Senior Circuit Judge.
 
 
 1
 The Confederated Tribes of the Colville Reservation appeal the judgment of the United States Claims Court in Confederated Tribes v. United States, 20 Cl.Ct. 31 (1990). Therein the Claims Court granted the United States' (Government) motion for partial summary judgment on the issue of liability, denied the Tribes' cross motion for partial summary judgment and dismissed their petition which sought compensation for water power values of tribal lands taken in connection with the construction of the Grand Coulee Dam in the State of Washington. The court held that in authorizing the construction of the Dam, "Congress intended to create a multiple-purpose project with navigational benefits" and that the "full and proper assertion" of the U.S.'s navigational servitude was superior to all of the Tribes' legal, equitable and moral claims. Id. at 34. We affirm-in-part and reverse- and remand-in-part.
 
 BACKGROUND
 
 2
 The Colville Reservation, originally an approximately three million acre expanse, bounded on the south and east by the Columbia River, on the west by the Okanogan River and on the north by the Canadian border, was created by Executive Order of President Ulysses S. Grant on July 2, 1872, and was home over the years to fourteen Indian tribes.[1] In 1891, the Tribes ceded 1.5 million acres of the Reservation, see Confederated Tribes, 20 Cl.Ct. at 34 nn. 4, 5, and were promised in return that their remaining lands would be protected.[2] In 1910 Congress passed legislation which authorized the Secretary of the Interior to protect and reserve from "location, entry, sale, allotment, or other appropriation any lands within any Indian reservation, valuable for power or reservoir sites...." Act of June 25, 1910, ch. 431, §§ 13, 14, 36 Stat. 855, 858-59 (the Secretary explained in a letter to Congress, H.R.Rep. No. 1135, 61st Cong.2d Sess. (1910) at 5, that the purpose of this provision was to protect reservation lands from private development).
 
 
 3
 The United States initially decided to build the Grand Coulee Dam[3] on the Columbia River as a hydroelectric public works project under the National Industrial Recovery Act of 1933, Pub.L. No. 73-67, § § 201-207, 48 Stat. 195, 200-205, formerly codified at 40 U.S.C. §§ 401-403.[4] In 1940, in aid of the construction of the Grand Coulee Dam project, Congress granted to the United States "all the right, title, and interest of the Indians in and to the tribal and allotted lands within the Spokane and Colville Reservations ... as may be designated therefor by the Secretary of the Interior from time to time...." Act of June 29, 1940, Pub.L. No. 76-690, 54 Stat. 703, 704, codified as amended, 16 U.S.C. §§ 835d-835h. This Act also provided that the Secretary of the Interior was to determine the amount of "just and equitable compensation" for the tribal lands taken. Id., codified as amended, 16 U.S.C. § 835e.
 
 
 4
 More than 3,000 acres of tribal "fast lands"[5] were designated by the Secretary for the Grand Coulee Dam project and the Department of the Interior compensated the Tribes, as provided in the Act, in the sum of approximately $63,000. However, the compensation made to the Tribes did not include remuneration for the "water power values"[6] of upstream lands taken by the Government nor did it take into account both water power and ordinary values of certain riverbed lands upon which the Dam was built and to which the Tribes claim equitable title.[7] The Dam was completed in 1942.
 
 
 5
 On July 31, 1951, the Tribes filed a petition under section 2 of the Indian Claims Commission Act of 1946, Pub.L. No. 79-726, § 2, 60 Stat. 1049, 1050, formerly codified at 25 U.S.C. § 70a (1976) (ICCA).[8] In 1976 the Commission allowed the Tribes to file an amended petition in which they sought "just and equitable" compensation for the "water power values" of certain riverbed and upstream lands which had been taken by the Government as part of the Grand Coulee Dam development.[9] The Tribes claimed the right to this compensation under legal and equitable standards and also under the "fair and honorable dealings" clause of section 2 of the ICCA which provides a cause of action based upon principles of fairness and morality not cognizable in law or equity.
 
 
 6
 The Government moved for partial summary judgment on the issue of liability, maintaining that Congress, by constructing the Grand Coulee Dam, "asserted the sovereign's constitutional power to exercise the 'navigational servitude' " which promotes and aids navigation for the public good. The Government further contended that the Tribes could not recover under the "extra-legal" cause of action established in the "fair and honorable dealings" clause of section 2 of the ICCA because the Government did not assume any "special obligation" to secure water power values of the tribal lands taken in the Dam's construction.
 
 
 7
 The Tribes made a cross motion for partial summary judgment on the liability issue, arguing that "even if the navigational servitude was properly exercised by the defendant, it is subordinate to claims initiated under the extra-legal grounds of recovery provided by clauses (3), (4), and (5) in § 2 of the ICCA." 20 Cl.Ct. at 33.[10] The Tribes also argued that, regardless of the exercise of the navigational servitude, the Government undertook a special obligation "to secure water power values of tribal trust lands." They further maintained that by construction of the Dam, Congress did not intend to improve navigation in any substantive manner but that instead the Dam project was instituted for the purposes of reclamation thus undermining the existence of the "navigational" servitude. Id.
 
 
 8
 The Claims Court granted the Government's motion for partial summary judgment and denied the Tribes' motion, dismissing their petition and holding that Congress intended to enhance navigation in the construction of the Grand Coulee Dam and that the "full and proper assertion of the 'navigational servitude' is superior to all the Indian claims presented in this case...." Id. at 34.[11] The Tribes appealed.DISCUSSION
 
 
 9
 We review the Claims Court's legal conclusions, such as a grant of summary judgment, de novo. Milmark Servs., Inc. v. United States, 731 F.2d 855, 857 (Fed.Cir.1984); Heisig v. United States, 719 F.2d 1153, 1158 (Fed.Cir.1983). Such a standard of review provides this court with substantial latitude, not being bound by the Claims Court's judgment that no material facts were in dispute but rather free to evaluate de novo the evidence proffered by both parties to determine whether there are indeed genuine factual issues to be tried and whether the law was applied correctly. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed.Cir.1987). Furthermore, on appeal from the grant of summary judgment, the record will be viewed in the light most favorable to the party against whom summary judgment was granted, in this case, the Tribes. Lindley v. Amoco Prod. Co., 639 F.2d 671 (10th Cir.1981); Prochaska v. Marcoux, 632 F.2d 848 (10th Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981); Bailey v. Hartford Fire Ins. Co., 565 F.2d 826 (2d Cir.1977); Weiss v. Kay Jewelry Stores, Inc., 470 F.2d 1259 (D.C.Cir.1972); Kiess v. Eason, 442 F.2d 712 (7th Cir.1971); Building Mart, Inc. v. Allison Steel Mfg. Co., 380 F.2d 196 (10th Cir.1967).
 
 I.
 
 10
 The Claims Court relied on the Supreme Court's decision in United States v. Cherokee Nation, 480 U.S. 700, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987), for its holding that the navigational servitude was legally superior to the Tribes' claims. The Tenth Circuit in that case had affirmed the District Court's grant of summary judgment for the Cherokee Nation rejecting the position that the navigational servitude protected the Government from liability for such a taking and finding that "the United States did not reserve its navigational servitude...." Id. at 702, 107 S.Ct. at 1489. The Tenth Circuit, however, found that although the Government had in fact retained a navigational servitude in the Arkansas River, the court is required to balance the public and private interests at issue to determine if compensation for the taking of the riverbed lands was due. Thus, the Tenth Circuit ruled that the Cherokee Nation could, under the Fifth Amendment, recover the value of certain riverbed lands taken by the Government as part of a navigation project which included dredging the channel of the Arkansas River.
 
 
 11
 The Supreme Court reversed the Tenth Circuit's judgment and remanded, rejecting its use of a balancing test and stating that the Commerce Clause gives the Government
 
 
 12
 "a 'dominant servitude,' which extends to the entire stream and the stream bed below ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject."
 
 
 13
 Id. at 704, 107 S.Ct. at 1489 (quoting United States v. Rands, 389 U.S. 121, 123, 88 S.Ct. 265, 267, 19 L.Ed.2d 329 (1967)) (citation omitted). The Court added that although
 
 
 14
 "this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation," Kaiser Aetna v. United States, 444 U.S. 164, 172 [100 S.Ct. 383, 389, 62 L.Ed.2d 332] (1979), there can be no doubt that "[t]he Commerce Clause confers a unique position upon the Government in connection with navigable waters." United States v. Rands, 389 U.S. 121, 122 [88 S.Ct. 265, 266, 19 L.Ed.2d 329] (1967).
 
 Id. The Court concluded:
 
 15
 [W]e have repeatedly held that the navigational servitude applies to all holders of riparian and riverbed interests.
 
 
 16
 * * * * * *
 
 
 17
 As we have explained, the tribal interests at issue here simply do not include the right to be free from the navigational servitude, for exercise of the servitude is "not an invasion of any private property rights in the stream or the lands underlying it.... United States v. Rands, 389 U.S. at 123 [88 S.Ct. at 267].
 
 
 18
 Id. at 706, 707-08, 107 S.Ct. at 1491, 1492. Similarly, one of our predecessor courts has repeatedly held the public right of navigation is a dominant interest and that the United States' authority over navigable waters is supreme. See, e.g. Gordon v. United States, 211 Ct.Cl. 310, 311, 546 F.2d 430 (1976), cert. denied, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977); Goose Creek Hunting Club, Inc. v. United States, 518 F.2d 579, 583, 207 Ct.Cl. 323, (1975); Sherrill v. United States, 381 F.2d 744, 745-46, 180 Ct.Cl. 914, (1967); Marrett v. United States, 82 Ct.Cl. 1, 12 (1935), cert. denied, 299 U.S. 545, 57 S.Ct. 8, 81 L.Ed. 401 (1936).
 
 
 19
 The Tribes rely on Confederated Salish & Kootenai Tribes v. United States, 181 Ct.Cl. 739 (1967) (Flathead ), and United States v. 5,677.94 Acres of Land, 162 F.Supp. 108 (D.Mont.1958) (Crow ), for the proposition that the United States' navigational servitude does not relieve the Government from the duty to pay for the water power values of the appropriated lands. In Crow, the United States constructed the Yellowtail Dam on the Bighorn River, and in the process took tribal property on the Crow Reservation. In light of explicit language in the Crow Allotment Act of 1920, 41 Stat. 751, which provided that Crow land whose inherent value was increased by the development of water power was to be reserved "for the benefit of the Crow Tribe of Indians,"[12] (and in light of the policy of the Federal Power Act to assure that Indian tribes are paid for their power sites), the district court in Montana found:
 
 
 20
 in the Crow Allotment Act of 1920, Congress did recognize property rights of the tribe in lands used chiefly for water power, and these property rights may not be overlooked by the court in determining just compensation. It is not a case of paying more than "just compensation", but a recognition that by reason of the special provisions of this Act water-power value is a part of just compensation.
 
 
 21
 162 F.Supp. at 118.
 
 
 22
 Flathead dealt with the Kerr Dam on the Crow Indian Reservation in south central Montana, a project licensed under the Federal Power Act. The tribe there disputed the amount of revenue they should receive from the Dam. The Court of Claims held that because the determination as to the existence of a navigational servitude should only be the beginning of the inquiry, Congress could have recognized and intended to compensate the tribe for the water power value of the Kerr Dam site. After analyzing the applicable legislation and the history of the Reservation and relying on the Crow case and its interpretation of the 1920 Act, the court found that in this case Congress specifically did acknowledge and uphold the Tribe's right to the water power values in the Act of March 7, 1928, 45 Stat. 200.
 
 
 23
 The Government argues that the present case is distinguishable from Flathead in that this was not a license case and because "the [Confederated] Tribes have pointed to no language or legislative history like that of the Act of March 7, 1928 [cited in Flathead ] which might arguably suggest that Congress, by express language, intended to compensate the Tribes beyond the level required by the Constitution." The Government also maintains that Crow is distinguishable from the present case because there is not similarly specific language as that in the Crow Allotment Act in the legislation regarding the Colville Reservation tribes.
 
 
 24
 The Government is correct. Both of these decisions are distinguishable, first, in that they were decided prior to the Supreme Court's judgment in Cherokee Nation and, second, in that the unique facts of each case, especially where specific legislative language in both the Act of March 7, 1928, and the Crow Allotment Act of 1920 authorizes recovery for water power values, set them apart from any purported applicability in this case. Furthermore, the Federal Water Power Act of 1920 which became the Federal Power Act of 1935 played a part in both the Crow and the Flathead cases. Act of June 10, 1920, 41 Stat. 1068; Act of August 26, 1935, 49 Stat. 842, codified as amended, 16 U.S.C. § 803(e). Although before the Grand Coulee Dam was authorized as a federal project it had been provisionally licensed by the Federal Power Commission under the Act, that permit was cancelled when the Dam became a federal project and thus the Act does not apply to this case.
 
 
 25
 The construction of the Grand Coulee Dam does not entitle the tribe to compensation under the Fifth Amendment for the water power value of land where the United States has invoked its sovereign right to exercise its navigational servitude. The Claims Court, in a thorough legal analysis, found that given the applicable statutory language, the legislative history and the relevant case law, particularly Cherokee Nation, the Tribes' claims in law and equity were subordinate to the Government's exercise of its navigational servitude. We agree.
 
 
 26
 The Claims Court in the instant case thus correctly found that the Government's navigational servitude was legally superior to all of the legal and equitable claims presented by the Tribes. Cherokee Nation is controlling on that issue. To that extent, we affirm the Claims Court's judgment. However, Cherokee Nation cannot be and is not determinative of the Tribes' "fair and honorable dealings" claim. That issue, although argued to the District Court in Cherokee Nation, was not addressed by that court nor by the Tenth Circuit's initial decision and the Supreme Court specifically stated that this issue was not before it. See Cherokee Nation, 480 U.S. at 702 n. 1, 107 S.Ct. at 1489 n. 1. Because the Claims Court dealt with the "fair and honorable dealings" cause of action in a confusing manner, indeed without making basic, requisite fact findings necessary to determine the validity of this cause of action, we take this opportunity to correct the court's misapprehensions.
 
 II.
 
 27
 Procedurally, this court "must reverse the grant of a summary judgment motion if it appears from the record that there is an unresolved issue of material fact." 10 Wright & Miller, Federal Practice and Procedure § 2716, at 655-56. On cross motions for partial summary judgment, we must also reverse any issue concerning which there are still material facts in dispute and regarding which a grant of summary judgment would be inappropriate as a matter of law. Further, the Claims Court correctly stated in footnote 14 of its opinion that "summary judgment may not be appropriate in matters involving complex issues of Indian land law" and that in order to handle a litigation in an orderly and expeditious manner, courts have discretion to deny summary judgment on issues in which it might otherwise be appropriate, particularly "in fact-intensive takings jurisprudence seeking just compensation." Confederated Tribes, 20 Cl.Ct. at 38-39 n. 14 (citations omitted).[13]Fair and Honorable Dealings
 
 
 28
 The "fair and honorable" language appears historically to be the basis for a distinct cause of action under section 2 of the ICCA. In Otoe & Missouria Tribe v. United States, 131 Ct.Cl. 593, 131 F.Supp. 265, cert. denied, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955), the Court of Claims stated, in general, that
 
 
 29
 [t]he Indian Claims Commission Act is both remedial legislation and special legislation. It broadens the Government's consent to suit and as such is in derogation of its sovereignty. It confers special privileges upon the Indian claimants apart from the rest of the community, and to some extent is in derogation of common law. This was, we think, because of the peculiar nature of the dealings between the Government and Indians from very early times. On the other hand, it remedies defects in the common law and in pre-existing statutory law as those laws affected Indians, and it was designed to correct certain evils of long standing and well known to Congress.
 
 
 30
 Id. at 271. The Court of Claims found, regarding clause 5 of the ICCA, that the fact that it "creates a new cause of action against the United States seems too obvious for comment." Id. at 270. The court additionally explained:
 
 
 31
 in enacting the 1946 Indian Claims Commission Act, Congress had certain well-defined purposes in mind. Congress wished to settle all meritorious claims of long standing of Indian tribes and bands whether those claims were of a legal or equitable nature which would have been cognizable by a court of the United States had the United States been subject to suit and the Indians able to sue, or whether those claims were of a purely moral nature not cognizable in courts of the United States under any existing rules of law or equity.
 
 
 32
 Id. at 274-75.
 
 
 33
 As the Court of Claims stated in Creek Nation v. United States, 168 Ct.Cl. 483 (1964), the Indian Claims Commission Act does two things: it permits revision of treaties and agreements, and "permits consideration of Indian claims under the broad scope of 'fair and honorable dealings,' a latitude again which the court lacked prior to passage of the act. Choctaw Nation v. United States, 318 U.S. 423 [63 S.Ct. 672, 87 L.Ed. 877] (1942) [sic]." Creek Nation, at 489-90. "In claims brought under clause 5, ... the act commands the Commission to examine all of the facts presented to determine whether, in the broad moral sense, the conduct of the Government in its dealings with the Indians was fair and honorable." Id. at 494-95.
 
 
 34
 On the issue of whether or not the Government's exercise of its navigational servitude was superior to any or all of the Indians' claims presented in the instant case, the Claims Court held that none of the Tribes' theories subordinated the Government's navigational servitude defense, justifying this result by stating that "the constitutional power to assert the navigational servitude is dominant over any and all interests when it is properly exercised through an appropriate manifestation of congressional intent...." Confederated Tribes, 20 Cl.Ct. at 47. The Claims Court further said:
 
 
 35
 [I]t is obvious that Congress did not surrender any right to assert its sovereign powers under the Commerce Clause, much less the power to exercise the navigational servitude over Indian lands, in either explicit or implicit terms when it enacted the fair and honorable dealings clause of the ICCA.
 
 
 36
 * * * * * *Clearly, no matter whether the fair and honorable dealings clause of the ICCA is construed liberally or strictly, the Tribes have no right to recover for water power values upon the defendant's proper assertion of the navigational servitude. There is clearly no authority to suggest that Congress intended such a result when it enacted the ICCA, nor have the plaintiffs cited to any legislative history which produced the Act tending to support such an intent.
 
 
 37
 Id. at 50.
 
 
 38
 The court, in so finding, referred to the Supreme Court's decision in Cherokee Nation as "extremely persuasive, if not dispositive...." 20 Cl.Ct. at 47. However, as the Tenth Circuit recognized in its recent continuation of that case, Cherokee Nation v. United States, 937 F.2d 1539 (10th Cir.1991), and as previously stated herein, "the district court had addressed only the taking claim, and had not ruled on the fair and honorable dealings claim; the court of appeals accordingly did not consider that claim and it was not before the Supreme Court." 937 F.2d at 1541. Despite the fact that the Supreme Court's decision in Cherokee Nation did not consider the "fair and honorable dealings" cause of action, the Claims Court relied on that case when it found that the "navigational servitude" was "superior to all the Indian claims presented in this case for partial summary judgment." 20 Cl.Ct. at 34. This was error.
 
 
 39
 The Tenth Circuit's 1991 decision in Cherokee Nation dealt with the exact issue now before this court: whether the application of a navigational servitude, a legal construct, can defeat a claim based on moral duty. On remand from the Supreme Court to allow the district court to address the "fair and honorable dealings" claim, the parties made cross motions for summary judgment. In disposing of the case, the Tenth Circuit stated:
 
 
 40
 [W]e turn to the argument of the Cherokee Nation that the district court erred in applying the navigational servitude, a legal power, to defeat a claim based on a moral duty. Brief of Appellant at 29. We agree that the servitude is not in all instances a bar to a fair and honorable dealings claim, but we are convinced that the government's right to proper exercise of its navigational servitude should be given consideration as an important factor in this case.
 
 
 41
 A fair and honorable dealings claim will not necessarily be barred in every instance by Congress' constitutional power with respect to navigational servitudes.... We are persuaded that a claim like that presented here for compensation under the fair and honorable dealings clause cannot be determined without a judicial inquiry into the facts and circumstances of each case.
 
 
 42
 Id. at 1546 (citation omitted) (emphasis added).
 
 
 43
 The Government seeks to squelch the Tribes' cause of action under the "fair and honorable dealings" clause by arguing that the claim for water power values is a claim which is already recognized by law and equity and thus is not cognizable under section 2(5). To this end, the Government refers to and relies upon the Court of Claims' decision in Blackfeet & Gros Ventre Tribes v. United States, 119 F.Supp. 161, 127 Ct.Cl. 807, cert. denied, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 658 (1954), in which the affected tribes pled their claim in the alternative under clause 5 of section 2 of the Act. The court stated that because clause 5 refers to moral claims, a party might recover under clause 5 if it was not entitled to recover under any rule of law or equity, but that if its claim was recognized by the rule of law or equity, clause 5 did not apply. However, this language from Blackfeet has been repeatedly used out of context to limit a party's cause of action under the ICCA and the Claims Court so used it in this case.
 
 
 44
 In Blackfeet, the Court of Claims cited its earlier decision in Osage Nation v. United States, 119 Ct.Cl. 592, 97 F.Supp. 381, cert. denied, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672 (1951), which clarified the meaning of the language upon which the Government relies. Later, the Court of Claims in Minnesota Chippewa Tribe v. United States, 230 Ct.Cl. 776, 783 (1982), reviewed this confused series of cases. Quoting from Blackfeet, the Court of Claims stated:
 
 
 45
 In Osage Nation ... we merely held that the appellants could plead their claim under clause (3) and also plead it in the alternative under clause (5), and if it developed at the trial that their claim was not recognized under any rule of law or equity they were entitled to have it considered under clause (5). Appellants' claim in this case was one well recognized under established legal principles, and, hence, does not come within clause (5). (Emphasis supplied.) [119 F.Supp. at 168.]
 
 
 46
 Interpreting the import of that language, the Minnesota Chippewa court continued:
 
 
 47
 If we look at the language in the court's Osage Nation opinion, supra, which the Blackfeet court construed, the meaning of "recognized" as used by the Blackfeet court accords with this interpretation. In Osage Nation the court stated: "[w]e cannot agree with the Commission that the word 'recognized' was used in the sense of 'triable.' We believe it means that if, at the outset, a claim is not cognizable, or if at the trial it is not proved [hence allowable] and, therefore, decided favorably to petitioner under rules of law and equity, then petitioner is entitled to have it considered under the fair and honorable dealings clause." (Emphasis supplied.) [119 Ct.Cl. at 670.]
 
 
 48
 Similarly, in this case, plaintiffs' taking claim is not allowable because of the res judicata bar, but they are entitled to have the same facts, alleged to be a taking, considered under the fair and honorable dealings clause.
 
 
 49
 Minnesota Chippewa, 230 Ct.Cl. at 783. As also quoted in Blackfeet, Western Cherokee Indians v. United States, 116 Ct.Cl. 665, 89 F.Supp. 1006, 1012, cert. denied, 340 U.S. 903 & 904, 71 S.Ct. 279, 95 L.Ed. 654 (1950), stated:
 
 
 50
 Clause (5) was intended, as its language clearly shows, when considered in the light of its history and other provisions of Section 2, to cover only moral claims based on justice and fair dealings or broad principles of equity and justice, with respect to which no court had theretofore made a determination on the merits, or could have made such a determination under the terms of prior jurisdictional acts.
 
 
 51
 The Government's reliance on Blackfeet in its attempt to prevent the Tribes from claiming a cause of action under the "fair and honorable dealings" clause fails. The Blackfeet language alluded to does not stand for the proposition that the Tribes' "fair and honorable dealings" claim must fail because their water power value claim is already recognized in law and equity.
 
 
 52
 In finding as it did--that the Government's navigational servitude was superior to all other interests--the Claims Court erroneously attempted to make a legal construct determinative of issues which are not necessarily limited to legal and equitable bases and thus contradicted the Tenth Circuit's well-reasoned view that the servitude did not, of necessity, overshadow and swallow up the moral claim. Although the Claims Court lucidly framed one of the Tribes' claims as "extra-legal," it attempted to resolve that issue by purely legal means. Section 2 of the ICCA illustrates that the scope of the Claims Court's analysis was unduly broad as it tried to sweep away a moral claim through legal analysis. Section 2 states that the "Commission shall hear and determine" the following claims:
 
 
 53
 (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; ... and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.
 
 
 54
 The facial juxtaposition between clause 1 and clause 5 indicates that, contrary to the Claims Court's interpretation, reliance on Constitutional theory and other laws in a navigational servitude analysis was not intended to be dispositive of a "fair and honorable dealings" claim. In fact, the Act clearly delineates between legal/equitable claims, including those based on the Constitution, and claims which "are not recognized by any existing rule of law or equity."
 
 
 55
 The Claims Court's dependence on a legal analysis to attempt to dispose of a moral claim--one which existed outside the bounds of the Constitution, laws, treaties of the United States, and Executive orders of the President--is misguided. As the Claims Court must realize, the United States can still be held liable where, even though it acts within the scope of its constitutional or legal authority, its conduct is less than fair or honorable to Indian tribes. Minnesota Chippewa Tribe v. United States, 11 Cl.Ct. 221, 240 n. 9 (1986) ("It is clear that the existence of a law in itself is not a defense to a clause 5 claim."); see Menominee Tribe of Indians v. United States, 607 F.2d 1335, 1341, 221 Ct.Cl. 506 (1979), cert. denied, 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980); Seminole Nation v. United States, 492 F.2d 811, 821 n. 11, 203 Ct.Cl. 637 (1974).
 
 
 56
 The Claims Court erred in its conclusion that a navigational servitude is unquestionably dominant over other concerns, including a "fair and honorable dealings" cause of action, and by failing to perform "a judicial inquiry into the facts and circumstances" of this case in light of the moral cause of action. That inquiry must of necessity include evaluation of whether or not the Government undertook a special relationship to the Tribes.
 
 Special Relationship
 
 57
 The Court of Claims, in Aleut Community v. United States, 480 F.2d 831, 202 Ct.Cl. 182 (1973), relying on a series of Indian cases[14], set out a four-part test for measuring the existence of a special relationship or obligation, which test actually determines whether the duty of "fair and honorable dealings" has been breached.[15] The court in Aleut stated that "[t]here must be a showing that the United States undertook an obligation, a 'special relationship', the obligation was to the Tribe, that the United States failed to meet its obligation, and that as a result the Tribe suffered damages." Id. at 839.[16]
 
 
 58
 Further, in United States v. Oneida Nation, 576 F.2d 870, 877, 217 Ct.Cl. 45 (1978), the Court of Claims applied the "special obligation" analysis it had set out in Aleut, finding that the course of dealings between the parties obligated the court to affirm the Commission's determination "that the relationship between the United States and the Oneidas' New York land was indeed special, 'and from it there stemmed a special responsibility' " (quoting Oneida Tribe of Indians v. United States, 165 Ct.Cl. 487, 493, cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964)). The court stated in Oneida Nation:
 
 
 59
 [i]t is just and appropriate that [the Government] be held responsible, under the "fair and honorable dealings" clause, for any failure of the Oneidas to receive fair compensation--even though, here too, no one can say with certainty that federal intervention would necessarily have prevented unfairness. Where there is a special responsibility, it is not "fair and honorable" to do less in help than one can and should reasonably do--regardless of whether that aid would in the end have proved decisive.
 
 
 60
 576 F.2d at 882.
 
 
 61
 Judge Nichols, dissenting from the finding that the government had a special relationship in this case, explored the texture of the moral judgment which is required to be made under the "fair and honorable dealings" cause of action. He explained:
 
 
 62
 Phrases such as "fiduciary role" and "special relationship" may make lawyers among us more comfortable, though they have no solid backing in legal or equitable rights and duties. Also, use of such language alluding to a moral judgment as if it were a technical rule of law, may raise fewer hackles....
 
 
 63
 The concept of a "special relationship" was I take it first floated in Oneida Tribe of Indians of Wisconsin v. United States, 165 Ct.Cl. 487, cert. denied, 379 U.S. 946 [85 S.Ct. 441, 13 L.Ed.2d 544] (1964), in which we insisted that a "special relationship" existed, only to hold that the United States in that case (having no relation or resemblance to this) did all the relationship, special or other, required of it. All it means is that though there is no contract or treaty obligation, or formal trusteeship, honor may oblige the United States to take steps to protect Indians, who have slipped into a dependence on the honor of the United States, by one means or another. What honor requires depends on circumstances and will vary from case to case according to the conscience of the court. In that case, the United States had attempted some protection, though ineffectual, and it was held honor was satisfied.
 
 
 64
 (Emphasis added.) Judge Nichols stated further, interpreting the "fair and honorable dealings" clause, "the United States has honorably waived its sovereign immunity, waived the statute of limitations, and exposed itself to suits not even founded on law or equity." 576 F.2d at 887.
 
 
 65
 On remand from the Supreme Court in Cherokee Nation, the district court found that "the Cherokee Nation had failed to establish that any special obligation or undertaking to the Cherokee Nation had been assumed by the United States by treaty, statute, agreement or representations," and thus this failing to meet the first element of the operative test indicated that summary judgment was appropriate for the United States. 937 F.2d at 1542. The Tenth Circuit affirmed the district court's finding.
 
 
 66
 The Tenth Circuit, at the outset of its opinion, correctly identified the legal standard against which to measure the existence vel non of a breach of 'fair and honorable dealings,' that being the Court of Claims' four-factor test enunciated in Aleut. Discussing the investigation which would be necessary to reach a conclusion on the existence of a special relationship, the court stated:
 
 
 67
 We agree that we should consider the background of statutes, treaties and any representations made to the Cherokee Nation to determine whether the requisite showing is made of a "special relationship" as an element of the fair and honorable dealings claim.
 
 
 68
 * * * * * *
 
 
 69
 Therefore, we do consider the historical events outlined for the purpose of determining whether a "special relationship" was created with a nexus to the construction and operation of the Navigational System complained of.
 
 
 70
 Cherokee Nation, 937 F.2d at 1543. The court also stated:We simply hold that in this case the requisite "special relationship" between the government and the Cherokee Nation has not been sufficiently established to demonstrate that the government's exercise of the servitude here was a violation of any special obligations to the Tribe. We are persuaded that a claim like that presented here for compensation under the fair and honorable dealings clause cannot be determined without a judicial inquiry into the facts and circumstances of each case.
 
 
 71
 Id. at 1546. The Tenth Circuit further stated: "We agree that Congress intended the [Indians] to have the full panoply of remedies--legal, equitable and moral--laid out in the five clauses of the Indian Claims Commission Act." Id. at 1547.
 
 
 72
 On several occasions, the Court of Claims has found that, in cases which were based at least in part on the "fair and honorable dealings" clause of the ICCA, the factual findings made by the Commission provided inadequate support for the Commission's disposition. In those cases, the Court of Claims was forced to remand them to the Commission for further findings as to the existence of a special relationship between the Government and the Indians or for a supplementation of the basic factual record on the issue of fair and honorable conduct. In Lipan Apache Tribe v. United States, 180 Ct.Cl. 487, 502 (1967), the Court of Claims stated:
 
 
 73
 "It is essential ... to determine if a special relationship was created; the nature and scope of any responsibilities assumed by the United States; and whether the Federal Government met these obligations. The answers to these issues are not readily apparent from the materials presented to this court, but it is clear that the petition should not have been dismissed at this stage. We, therefore, remand the case to the Indian Claims Commission to make the necessary findings on these issues...."
 
 
 74
 In Snake or Piute Indians v. United States, 112 F.Supp. 543, 552, 125 Ct.Cl. 241 (1953), the Court of Claims further elucidated:
 
 
 75
 a finding respecting fair and honorable dealings is even more clearly in the nature of an inference to be drawn from all the relevant evidentiary or basic facts bearing on the entire course of dealings between the parties. And it is for the Commission in the first instance to make findings concerning all such facts as may appear in the record so that we may know precisely upon what basis the ultimate factual inference is made. That something or someone is or is not fair or honorable is always a conclusion or an inference based upon many factual considerations.
 
 
 76
 (Citation omitted.) The court further explained:
 
 
 77
 A determination of whether or not a course of dealing by the United States with and in relation to bands or a tribe of Indians was in the last analysis fair and honorable, can be made only after a very thorough and careful consideration not only of what was actually done, but also of that which was not done and of the motives and circumstances surrounding and underlying the overt acts of the parties, and their intentions, etc.... The evidentiary facts based on the circumstances establishing such justification, or the lack of it, are facts as indispensable on the issue of fair and honorable dealings, as the bare facts of the dealings themselves.
 
 
 78
 Id. at 560-61.
 
 
 79
 Although the Tribes argue on this appeal that the Government clearly undertook a special relationship to the Colville Tribes concerning power sites, they also recognized that the Claims Court did not examine the dealings between the Tribes and the Government in regard to the power sites. The Tribes argue in this case that "if there is any question as to whether the course of dealings between the United States and the Colville Tribes gives rise to a special relationship with regard to water power values of tribal lands, then that question requires a factual determination--a fact determination that was never conducted by the Claims Court."[17]
 
 
 80
 The Claims Court stated in footnote 24 of its opinion, "we would be unable to grant the Tribes' motion [for partial summary judgment] even if a fair and honorable dealings claim could subordinate a defense based on the navigational servitude because such a claim is inherently a fact question that is subject to dispute between the litigants." Confederated Tribes, 20 Cl.Ct. at 51 n. 24. The court appears to here acknowledge that, in effect, the argument that a fair and honorable dealings cause of action could take precedence over the legal exposition of a navigational servitude depends on the facts. The court was correct. This question is one of fact, one which is material and which is in dispute between the litigants. Inasmuch as there is an extant disputed issue of fact, albeit fact viewed from a moral rather than a legal standpoint, the Claims Court here seemingly admits that without findings as to these facts a grant of partial summary judgment for the Government would be error. We agree.
 
 
 81
 The Claims Court further appears to have at least facially recognized the existence of the "special obligation" standard from the parties' arguments which it sets forth. See id. at 36-38. However, the court's analysis of this point as applied to this case was virtually nonexistent. It neglected the body of case law which interprets and develops the "special obligation" construct, only barely alluding to the standard and neglecting to analyze the factual circumstances in light of it. The Claims Court stated tersely, unsupported by subsidiary factual findings and without reference to the Aleut standard as subsequently developed and applied:
 
 
 82
 We also reject the Tribes' claim that they are entitled to additional compensation for water-related values under traditional legal principles. In this context, we find that the defendant has never assumed any special obligation to secure water power values for the tribal lands taken in and of the Grand Coulee Dam project.
 
 
 83
 Id. at 52 (emphasis added) (footnote omitted). With no fact findings from which to review the propriety of the Claims Court's conclusion that the Government did not assume a special obligation, and without mention of the correct standard to be applied when making that finding, we are left with the firm conviction that the Claims Court has erred by proffering an incomplete analysis of this issue.
 
 
 84
 We find that this is one of the instances contemplated by the Court of Claims in its decision in Creek Nation in which "the [ICCA] requires the [fact finder] to hear the Indians' claim of unfair and dishonorable dealings on the merits" instead of solely reviewing a summary judgment grant, and that "[u]nless this be done, there is a failure to fulfill the objective of the act to give the Indians a full day in court on all issues not adjudicated by a competent body." Creek Nation, 168 Ct.Cl. at 495. Further, we, like the court in Lipan, find that the answers to our questions "are not readily apparent from the materials presented to this court, but it is clear that the petition should not have been dismissed at this stage." Lipan, 180 Ct.Cl. at 502. This case involves "complex issues of Indian land law" coupled with "fact-intensive takings jurisprudence seeking just compensation" thus making it inappropriate for resolution on summary judgment.
 
 
 85
 This court affirms the portion of the Claims Court's grant of partial summary judgment supported by the determination that the Government's navigational servitude was superior to the Tribes' legal and equitable claims. However, because the Claims Court erred in construing the legal issues as dispositive of the Tribes' moral claim and because the court failed to make fact findings on the existence vel non of a special relationship in light of the Aleut standard, we reverse that portion of the Claims Court's grant of partial summary judgment which deals with the cause of action under the "fair and honorable dealings" clause and the existence vel non of a special obligation on the part of the Government vis a vis the Tribes. We remand for factual findings and an opinion on whether or not the course of dealings between the United States and the Colville Tribes gave rise to a special relationship or obligation with regard to the water power values of tribal lands and whether that obligation, assuming it existed, was a responsibility to the Tribes, one which the Government failed to live up to and which resulted in damages to the Tribes. Aleut. Because of the Claims Court's failure to fully and fairly address this question, we order the reinstatement of the Tribes' petition and remand this issue to the Claims Court for an analysis of all relevant facts which, in light of the "special relationship" test enunciated in Aleut and related cases, bear on the issues of liability and damages as they arise under section 2, clause 5 of the Indian Claims Commission Act.
 
 COSTS
 
 86
 Each party shall bear its own costs.
 
 
 87
 AFFIRMED-IN-PART, REVERSED- AND REMANDED-IN-PART.
 
 
 88
 NIES, Chief Judge, concurring.
 
 
 89
 I agree with much of the scholarly opinion of my colleague. Nevertheless, I feel compelled to write because I believe I have a somewhat different understanding of the remaining issues in this action. The majority remands for a determination of whether the Tribes have a fair and honorable dealings claim without providing in my view, sufficient focus for the remand inquiry. If the majority means to leave open the possibility that the Tribes may, under the fair and honorable clause of the Indian Claims Commission Act of 1946, Pub.L. No. 79-726, § 2, 60 Stat. 1049, formerly codified at 25 U.S.C. § 70a (1976) (ICAA), have a claim for compensation for riverbed lands, the title to which the United States did not actually acquire (i.e., through inverse condemnation) and for water power values associated with Tribal lands that were purchased, I disagree. That possibility is, in my view, foreclosed for the reasons explained herein. Nevertheless, I agree that there should be a remand for consideration of the Tribe's fair and honorable dealings claim. Before getting to an analysis, I find it necessary to set out in more detail the statutes and facts relating to the issues before us.
 
 
 90
 By agreement between the United States and the Colville Tribes dated May 9, 1891, ratified by the Act of June 21, 1906, c. 3504, 34 Stat. 325, 377-78, the United States agreed:
 
 
 91
 that said Indians shall enjoy without let or hindrance the right at all times freely to use all water power and water courses belonging to or connected with the lands to be ... allotted.
 
 
 92
 By the Act of June 25, 1910, c. 431, §§ 13, 14, 36 Stat. 855, 858-859, the Secretary of the Interior was authorized, for the benefit of Indian tribes, to reserve from "location, entry, sale, allotment, or other appropriation any lands within any Indian reservation, valuable for power or reservoir sites...." At Colville, power sites which had been already allotted were not cancelled, but the Secretary withdrew and reserved for the Tribes numerous power sites including significant portions of the flood areas later taken for the Grand Coulee Dam. From the materials of record, it appears that the actual Grand Coulee Dam site was not a reserved site.
 
 
 93
 Under Section 10e of the Federal Power Act of 1935, 49 Stat. 842, codified as amended at 16 U.S.C. § 803(e), licensees must pay Indian tribes annual fees based on power production for the use of Indian power sites. The Tribes' brief states--and it is not contradicted--:
 
 
 94
 During the years 1927-1931, at the direction of Congress, the Corps of Engineers investigated the Columbia River and its tributaries. The Corps' Report listed a number of sites, including Grand Coulee, where power could be produced at low cost, and recommended that the development be performed by local governmental authorities or private utilities under the Federal Power Act (then the Federal Water Power Act). App. pp. 122, 124. Shortly thereafter, the Columbia Basin Commission, an agency of the State of Washington, applied for, and in August 1933 received, a preliminary permit from the Federal Power Commission for the water power development of the Grand Coulee site. App. pp. 126-141. The permit recognized that the dam project "would affect lands within the Colville and Spokane Indian Reservations" (App. p. 137) and specifically made the permit subject to "[s]uch provisions as the Secretary of the Interior and the Bureau of Indian Affairs may commend, and the [Federal Power] Commission may approve, for the protection of the interests of the Indians of the Colville and Spokane Indian Reservations, and any other Indian lands which may be affected; including such payments by the licensee for the use of Indian lands as the Commission may determine to be reasonable; * * *." App. p. 138.
 
 
 95
 However, the above identified preliminary permit was cancelled. Instead, the federal government, which is not subject to the Federal Power Act, undertook to build the dam. That action precluded fruition of efforts by the Tribes to commercialize their water power.
 
 
 96
 The federal government began building the dam in the mid-30's. The record before us does not disclose from whom the government acquired the lands at the dam site. However, a condemnation case, Continental Land Co. v. United States, 88 F.2d 104 (9th Cir.1937), appears to concern that acquisition from Continental and informs us:
 
 
 97
 The nearest tribal land of the Colville Indian Reservation is half a mile above the dam. This reservation extends along the side of the river for over 100 miles. It is not possible to construct a dam at that site without flooding both the allotted and the tribal lands of the Colville Indian Reservation. The Spokane Indian Reservation will likewise be flooded by the back waters.
 
 
 98
 It was not until the dam was almost complete that Congress authorized acquisition of Tribal lands needed for the project. Act of June 29, 1940, c. 460, 58 Stat. 887, codified as amended at 16 U.S.C. § 835d et seq. Pursuant to that authority the Secretary of Interior designated and paid for Tribal lands that would be flooded. Although unclear, it appears that the Tribes assert a right to compensation for the taking of lands in the river to its midpoint on which the dam was actually built, as well as for the entire stretch of the river along the border of the reservation. The government disputes that the Tribes own any riverbed lands and that issue is not here resolved.
 
 Compensation for Lands Taken
 
 99
 The first issue raised, concerns the Tribes' entitlement to compensation for water power values associated with their lands. The Tribes assert that even though the navigational servitude may be exercised by the United States without liability under the Constitution for water power values of riverbed or riparian lands, Congress is free to provide for compensation and has done so with respect to the power values of Colville lands by entering into the 1891 agreement with the Tribes and by enacting the three statutes discussed above. The Tribes argue that by these acts Congress specifically undertook to protect Indian water power values and effectively waived the sovereign's right to exercise the power of navigational servitude without compensation.
 
 
 100
 In United States v. Cherokee Nation of Oklahoma, 480 U.S. 700, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987), the Supreme Court addressed the question whether compensation for a taking was required for the Cherokee's riverbed lands by reason of navigational improvements made on the Arkansas River. The federal project damaged sand and gravel deposits in the riverbed which was owned by the Tribe. As explained therein:
 
 
 101
 Though "this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation," Kaiser Aetna v. United States, 444 U.S. 164, 172 [100 S.Ct. 383, 389, 62 L.Ed.2d 332] (1979), there can be no doubt that "[t]he Commerce Clause confers a unique position upon the Government in connection with navigable waters." United States v. Rands, 389 U.S. 121, 122 [88 S.Ct. 265, 266, 19 L.Ed.2d 329] (1967). It gives to the Federal Government "a 'dominant servitude,' FPC v. Niagara Mohawk Power Corp., 347 U.S. 239, 249 [74 S.Ct. 487, 493, 98 L.Ed. 666] (1954), which extends to the entire stream and the stream bed below ordinary highwater mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject." Rands, supra, at 123 [88 S.Ct. at 267]. See also United States v. Kansas City Life Ins. Co., 339 U.S. 799, 808 [70 S.Ct. 885, 890, 94 L.Ed. 1277] (1950); Scranton v. Wheeler, 179 U.S. 141, 163 [21 S.Ct. 48, 57, 45 L.Ed. 126] (1900).
 
 
 102
 Id., 480 U.S. at 704, 107 S.Ct. at 1489-1490 (footnotes omitted). As further explained, to overcome the servitude imposed on all owners of riverbed rights in navigable waters, there must be a waiver. Moreover, the Court stated:
 
 
 103
 "[s]uch a waiver of sovereign authority will not be implied, but instead must be 'surrendered in unmistakable terms.' " Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52 [106 S.Ct. 2390, 2397, 91 L.Ed.2d 35] (1986), quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 [102 S.Ct. 894, 907, 71 L.Ed.2d 21] (1982). Respondent can point to no such terms.
 
 
 104
 Id. 480 U.S. at 707, 107 S.Ct. at 1491.
 
 
 105
 Here as well, as the Claims Court held, there is no explicit waiver of the navigational servitude by treaty or statute. Thus, because of the servitude, the Tribes are not entitled to compensation for the claimed riverbed lands which were not, therefore, "taken", nor for water power values of riparian lands as part of compensation for the taking of those lands. To this extent, the majority has affirmed the Claims Court.
 
 Fair and Honorable Dealings Claim
 
 106
 Turning to the fair and honorable dealings claim, although I agree that a remand is appropriate, I reach that conclusion under a different analysis from that of the majority.
 
 
 107
 Under section 2(5) of the ICCA, Congress created a retroactive statutory claim for damages for a failure by the United States to live up to a standard of "fair and honorable dealings" with an Indian tribe that is "not recognized by any existing rule of law or equity." I find it confusing and unhelpful to describe or think of this claim as "extra-legal," see Confederated Tribes v. United States, 20 Cl.Ct. 31, 33 (1990), or to say that the Claims Court "erroneously attempted to make a legal construct (a navigational servitude defense) determinative of issues which are not necessarily limited to legal and equitable bases." Majority's op. at 1112. After enactment of this cause of action, such claim is as "legal" as any other statutory claim which never previously existed at law or equity. Given broad direction from Congress, it is incumbent on the courts to define what are the metes and bounds of a "fair and honorable dealings" claim.[1] Thus, the courts may recognize that the sovereign's navigational servitude negates, in appropriate circumstances, a fair and honorable dealings claim. Indeed, merely by recasting a "takings" claim as a breach of "fair and honorable dealings," in my view, the Tribe cannot escape that sovereign power. The ICAA language does not meet the requirement that a Constitutional power can be overcome only by express waiver. See Cherokee, 480 U.S. at 707, 107 S.Ct. at 1491. That appears to be what the Claims Court held and I agree. However, I do not believe that ends this case.
 
 
 108
 In Aleut Community v. United States, 480 F.2d 831, 202 Ct.Cl. 182 (1973), the Court of Claims set out a four part test for establishing a fair and honorable dealings claim:
 
 
 109
 There must be a showing that the United States undertook an obligation, a "special relationship", the obligation was to the Tribe, that the United States failed to meet its obligation, and that as a result the Tribe suffered damages.
 
 
 110
 Id., 480 F.2d at 839. Aleut dealt with the fishing and hunting dependency of the Tribes and found a breach of fair and honorable dealings by the United States restricting the Aleuts to a single island which was unable to support the native population and which forced them into dire poverty. Each of the factors of the test was held to be satisfied.
 
 
 111
 In United States v. Oneida Nation of New York, 576 F.2d 870, 217 Ct.Cl. 45 (1978), the United States was found to have a "special responsibility" to the Oneidas to protect them, as far as it could, in the possession of their lands in the State of New York because of the Tribes' assistance during the Revolutionary War. Since the Continental Congress did nothing to impede or discourage the sale of Oneida lands to the State of New York at an "unfair price," the Court of Claims upheld the Oneida's claim for damages against the United States under the fair and honorable dealings clause. The Court explained that the Continental Congress "did not do the minimum required of it; instead it wholly shirked its obligation," stating:
 
 
 112
 Where there is a special responsibility, it is not "fair and honorable" to do less in help than one can and should reasonably do--regardless of whether that aid would in the end have proved decisive.
 
 
 113
 Oneida, 576 F.2d at 882. Oneida does not mention the Aleut "test" set out a few years before and the facts, as stated, do not appear to satisfy the four-element test inasmuch as the Continental Congress could not control either party to the land sale. The Oneida majority essentially made a moral judgment that the United States did not live up to its "fiduciary" responsibilities toward the Tribe.[2]
 
 
 114
 Here, the Tribes assert that a special relationship concerning hydropower was created between the United States and the Tribes by the 1891 agreement with the Tribes, statutes recognizing hydrosites as assets of reservations, actual withdrawal of the Colville power sites, granting and cancelling a power license, and commitments made to the Tribes and to the Bureau of Indian Affairs upon that cancellation.
 
 
 115
 I do not believe the Aleut standard fits this case well. Like the majority in Oneida, I do not accept Aleut as setting out the definitive word on the metes and bounds of a statutory "fair and honorable dealings" claim. It is only one possible standard. The statutory language itself suggests the viability of a claim based on a course of dealings between the government and a Tribe (rather than on a "special relationship"). I believe this is more than merely a semantic difference. A course of dealings requires an evaluation of conduct, i.e., "dealings" between the United States and the Tribes and then a judgmental evaluation of whether that conduct was unfair or dishonorable on the part of the United States and resulted in damage to the Tribes. While the statutes relied upon by the Tribes do not waive sovereign power, they are, nevertheless, pertinent to the fair and honorable dealings claim in that the statutes recognized the value of water power as an asset of the Tribes and provided for federal licensing of nonfederal development. Before the federal Grand Coulee project, it is undisputed that the Tribes were attempting commercial development of the Columbia River from riparian lands upstream from Grand Coulee.
 
 
 116
 Given these circumstances, the Colville Tribes may have a claim based on a "course of dealings" respecting the Tribes' development of water power which would not be tied to considerations respecting valuation or taking of its land which in this case is subject to navigational servitude. As a claim for unfair dealings respecting the Tribes' own development of water power (apart from the taking of land), navigational servitude becomes only a factor to be considered rather than a bar. See Cherokee Nation at Okla. v. United States, 937 F.2d 1539, 1546 (10th Cir.), modified and reh'g denied, 948 F.2d 635, 637 (1991), petition for cert. filed (Feb. 24, 1992) (No. 91-1354) (navigational servitude, though not a bar to a fair and honorable dealings claim, "should be considered as an important factor").
 
 
 117
 In my view, the Tribes in this case may have a claim comparable to that asserted in Gila River Pima-Maricopa Indian Community v. United States, 684 F.2d 852, 231 Ct.Cl. 193 (1982).[3] There, the Indian Community asserted a "fair and honorable dealings" claim for compensation for the loss of irrigation water which they could have captured each year since 1868 and beneficially utilized on their tribal lands but which was, instead, diverted by upstream non-Tribe users. The asserted claim sought compensation for the lack of sufficient water each year to irrigate all practicably irrigable lands of their reservation, approximately 167,846 acres. The Indians stated that the issue was, "Did the Federal Government do whatever it was required to do, in the circumstances[?]". Gila River, 684 F.2d at 861; see also Oneida Tribe of Indians of Wisconsin v. United States, 165 Ct.Cl. 487, 494, cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964). The court concluded that "the United States could not honorably or fairly avert its face from the continuous loss of water suffered by the Pimas and Maricopas. Reasonable action was required to end the loss or to provide an equivalent supply." Gila River, 684 F.2d at 862. Inasmuch as the government delayed taking action for a period of years, the government was held liable for the breach of fair and honorable dealings, but the claim was limited to the same 7,000 to 8,000 acres which was the maximum the Indians were able, when the full flow of the river was available to them, to put into cultivation.
 
 
 118
 Like the Pima-Maricopa Indians who were irrigating their lands, the Tribes of the Colville Reservation were endeavoring to exploit the natural assets of their Reservation by developing water power sites along the Columbia River. In the Pima-Maricopa's case, the United States' unfair and dishonorable dealings amounted to its knowing failure to prevent others from interfering with the endeavors of the Pima-Maricopa Indians. Here, the United States itself knowingly interfered with and frustrated the endeavors of the Colville Tribes. Thus, I agree with the majority that this case must be remanded. I would not, however, leave the remand open ended. The only possible basis for the fair and honorable dealings claim relates to the dealings of the United States which may have precluded the Tribes from obtaining economic benefits on its own from the available water power to riparian Tribal lands, but for the building of the Grand Coulee Dam.
 
 
 
 [1]
 The Reservation was occupied by the Colville, Lake, Sanpoil-Nespelem, Okanogan, Methow, Columbia, Wenatchee, Chelan, Entiat, Palus, Calispel, Spokane, Coeur d'Alene and Joseph's Band of the Nez Perce Indians. The Calispel, Spokane and Coeur d'Alene tribes were subsequently moved to other reservations
 
 
 [2]
 Article 6 of the May 9, 1891 Agreement states:
 It is stipulated and agreed that the lands to be allotted as aforesaid to said Indians, and the improvements thereon, shall not be subject within the limitations prescribed by law to taxation for any purpose, national, state or municipal; that said Indians shall enjoy without let or hindrance the right at all times freely to use all water power and water courses belonging to or connected with the lands to be so allotted, and that the right to hunt and fish in common with all other persons on lands not allotted to said Indians shall not be taken away or in anywise abridged.
 The agreement was ratified by the Act of June 21, 1906, 34 Stat. 325, 377-78.
 
 
 [3]
 The Grand Coulee Dam on the Columbia River created a 51 mile long lake in the Columbia canyon and backs water 29 miles up in the canyon of the tributary Spokane River, storing some 5 million acre feet of water. The Dam was 550 feet high, 4,290 feet long on the crest, and was to produce 2,100,000 horsepower at a depression-era cost of $392,000,000
 
 
 [4]
 The Supreme Court's decision in United States v. Arizona, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935), held that the construction of the Parker Dam on the Colorado River, a project then in progress in Arizona, had not been authorized by Congress although included in the comprehensive program of public works authorized by the National Industrial Recovery Act. In response to this decision, the Parker Dam and the Grand Coulee project were reauthorized and adopted under the Rivers and Harbors Act of 1935, Pub.L. No. 74-409, § 2, 49 Stat. 1028, 1039-40, codified as amended, 33 U.S.C. § 401 (1988), as a power, reclamation, navigation and flood control project
 
 
 [5]
 "Fast" lands are those above the high water mark, which when flooded are considered a taking and subject to just compensation. United States v. Kansas City Life Ins. Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); United States v. Willow River Power Co., 324 U.S. 499, 509, 65 S.Ct. 761, 767, 89 L.Ed. 1101 (1945). Under the Commerce Clause, Congress may improve navigation of a waterway without creating an obligation to pay compensation for taking of riverbed interests up to the mean high water mark. A navigational servitude extends to the lands beneath and within the stream's ordinary high water mark and inside the bed of the navigable water. See, e.g., Willow River, 324 U.S. at 509, 65 S.Ct. at 767; Owen v. United States, 851 F.2d 1404 (Fed.Cir.1988) (in banc )
 
 
 [6]
 In claiming entitlement to "water power values," the Tribes maintain that the Government "failed to pay compensation for the hydroelectric power generated by the flow of the Columbia River over tribal lands taken in aid of the Grand Coulee Dam." Confederated Tribes v. United States, 20 Cl.Ct. 31, 36 (1990)
 
 
 [7]
 The Tribes claim equitable title to the riverbed of the Columbia River, which borders the Reservation, to the midpoint in the channel. In a 1914 decision of the Secretary of the Interior, J.H. Seupelt, 43 I.D. 267 (1914), the Secretary held that the boundary of the Colville Reservation was located at the middle of the channel of the Columbia River where it forms the eastern and southern border and that the Tribes thus own the riverbed to midstream. This finding was confirmed in a June 3, 1974 Memorandum from the Solicitor of the Department of Interior to the Secretary
 
 
 [8]
 Section 2 of the Indian Claims Commission Act of 1946, Pub.L. No. 79-726, § 2, 60 Stat. 1049, 1050, formerly codified at 25 U.S.C. § 70a (1976) (ICCA), states:
 The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska:
 (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by an existing rule of law or equity.
 
 
 [9]
 Public L. No. 94-465, § 2, 90 Stat. 1990 (1976), dissolved the Indian Claims Commission, effective September 30, 1978, and transferred to the United States Court of Claims all cases currently pending before the Commission. Accordingly, the Tribes' claim was transferred to the Court of Claims. This law also gave the Court of Claims jurisdiction to adjudicate all such cases under the provisions of section 2 of the Indian Claims Commission Act. The Court of Claims' duty was to apply the law of the Indian Claims Commission Act including section 2 which is the Commission's jurisdictional grant. The Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, § 149, 96 Stat. 25, 46, transferred the trial jurisdiction of the United States Court of Claims to the Claims Court, and transferred the appellate jurisdiction of the Court of Claims to the Federal Circuit Court of Appeals
 
 
 [10]
 This court has noted that a cross motion for summary judgment may make suspect a later assertion on appeal that there were disputed factual questions. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed.Cir.1987)
 
 
 [11]
 The United States Court of Appeals for the District of Columbia Circuit has questioned the Grand Coulee Dam's status as an artificial aid to navigation. Washington Water Power Co. v. FERC, 775 F.2d 305, 331 (D.C.Cir.1985). The D.C. Circuit stated that the Dam could not retroactively convert the Spokane River, the Columbia's major tributary, into a navigable waterway because it was not a "reasonable improvement" to the navigability of the river. Id. Quoting the Supreme Court's decision in United States v. Appalachian Elec. Power Co., 311 U.S. 377, 407 n. 26, 61 S.Ct. 291, 299 n. 26, 85 L.Ed. 243 (1940), the court stated that there are and must be "obvious limits to such improvements as affecting navigability ... [which] limits are necessarily a matter of degree" and that "[n]avigability must be achieved at a reasonable cost." Washington Water Power, 775 F.2d at 331. The court further emphasized that without this "reasonableness" limitation on the navigability characterization, then "the gnarliest rivulet in the Rockies might be made to accommodate pleasure craft if the energy and enormous capital outlay it took to build Grand Coulee were devoted to the task." Id. And thus in balancing the Grand Coulee Dam's utility to navigation against its costs, the court reasoned, "[w]e may safely conclude, following the Appalachian Court, that as a matter of degree the Court did not mean to include concrete works of titanic proportions (550 feet high and 4,290 feet long) involving 'high engineering skill and the expenditure of vast amounts of money' [$392 million depression-era dollars] as reasonable improvements to navigability." Id. (citations omitted) (footnote omitted)
 
 
 [12]
 Section 10 of the Crow Allotment Act of 1920, 41 Stat. 751 states:
 Any unallotted lands of the Crow Reservation chiefly valuable for the development of water power shall be reserved from allotment or the disposition hereunder, for the benefit of the Crow Tribe of Indians.
 
 
 [13]
 This court, sitting in banc in Owen v. United States, further stated:
 Although the Court has held that compensation may not be required as a result of the federal navigational servitude for alleged takings involving the public right of navigation, it is clear that whether the government action went so far as to amount to a "taking" is a separate and distinct inquiry from the existence of the navigational servitude itself.... Such "taking" inquiries are often decided on the basis of narrow, factual distinctions, Kaiser Aetna, 444 U.S. at 175 [100 S.Ct. at 390],.... As factual issues, they are rarely proper for resolution on the pleadings.
 Owen, 851 F.2d at 1416 (emphasis added) (citation omitted).
 
 
 [14]
 Gila River Pima-Maricopa Indian Community v. United States, 684 F.2d 852, 231 Ct.Cl. 193 (1982); Lipan Apache Tribe v. United States, 180 Ct.Cl. 487 (1967); Oneida Tribe of Indians of Wisconsin v. United States, 165 Ct.Cl. 487, 493, cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964) (In light of the Indian Claims Commission Act, the United States has an obligation "greater than that of a non-participating bystander, or of a sovereign toward its ordinary citizens, or of a landowner toward his tenant. The relationship was special and from it there stemmed a special responsibility.")
 
 
 [15]
 The Aleut Community on the island sued the United States claiming that the Government had extinguished the Aleuts' title to the island without just compensation which title the tribe had acquired from the Russian Government, that the Aleuts had a right to an accounting of funds and that the Government had failed to deal with the tribe in a fair and honorable manner. The Indian Claims Commission held that it was required to dismiss the "fair and honorable dealings" claim under the Court of Claims' decision in Gila River Pima-Maricopa Indian Community v. United States, 427 F.2d 1194, 190 Ct.Cl. 790, cert. denied, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970)
 
 
 [16]
 The Court of Claims, however, applying the special obligation standard, found that the Government had undertaken a special relationship to the Aleuts of the island by recognizing, stemming from statutes enacted in 1870 and 1910, "the dependence of the appellants upon fishing and seal hunting for their continued existence" and by the fact that "the United States undertook to protect the appellants in securing their 'comfort, maintenance ... and protection.' " Aleut Community v. United States, 480 F.2d 831, 839, 202 Ct.Cl. 182 (1973). In light of this finding, the court reversed the Commission's dismissal of the "fair and honorable dealings" claim and remanded it for consideration of evidence bearing on the other three factors of the test
 
 
 [17]
 The Tribes state in their brief:
 The trial court thus erred in failing to consider in detail the course of action between the United States and the Tribes concerning power sites. Cherokee Nation does not excuse the court from that examination. Had the court conducted such an examination, the only proper conclusion would have been that the United States did not deal fairly and honorably with the Colville Tribes.
 Tribes' Brief, at 18. Further, the tribes stated in their reply brief, as included, supra, that because the necessary fact determinations had not been made, "[a]t the very least, then, summary judgment dismissing the claim was inappropriate." Tribes' Reply Brief, at 21-22 (citations omitted).
 
 
 [1]
 See, for example, the body of case law which this court has developed respecting the meaning of 19 U.S.C. § 1337, which prohibits "unfair methods of competition in the importation of goods into the United States."
 
 
 [2]
 See the erudite dissent of Judge Nichols, questioning the ability of judges to make this moral judgment on statesmen of the past. 576 F.2d at 882-887
 
 
 [3]
 At least there is enough record evidence to preclude summary judgment